2005-NMSC-006

108 P.3d 1019

**Jerry ARCHULETA, Petitioner–Respondent,**

v.

**SANTA FE POLICE DEPARTMENT, ex rel., CITY OF SANTA FE, Joanne Vigil Quintana, John Whitbeck, and Danielle Wilson, in their capacity as members of the Grievance Review Board of the City of Santa Fe, and The Grievance Review Board, Respondents–Petitioners.**

No. 28,630.

Supreme Court of New Mexico.

Feb. 24, 2005.

Bruce T. Thompson, City Attorney, Mark L. Allen, Assistant City Attorney, Miller Stratvert, P.A., Paula G. Maynes, Santa Fe, NM, for Petitioners.

Comeau, Maldegen, Templeman & Indall, L.L.P., Joseph E. Manges, Santa Fe, NM, for Respondent.

Patricia A. Madrid, Attorney General, Albert Roland Fugere, Special Assistant Attorney General, John W. Wheeler II, Special Assistant Attorney General, Santa Fe, NM, for Amicus Curiae, New Mexico Department of Public Safety.

Serra, Garrity & Masiowski, L.L.C., Diane M. Garrity, Santa Fe, NM, for Amicus Curiae, New Mexico Association of Counties.

Michael Schwarz, Santa Fe, NM, for Amicus Curiae, New Mexico National Employment Lawyers' Association.

## OPINION

MINZNER, Justice.

{1} The City of Santa Fe, on behalf of the Santa Fe Police Department (SFPD), appeals from a memorandum opinion issued by the Court of Appeals in which the court reversed the demotion of Jerry Archuleta, a Department employee, on grounds that he was denied due process in the administrative proceedings. *Archuleta v. Santa Fe Police Dep't.*, No. 23,445, — P.3d — (N.M.Ct. App. Apr. 5, 2004) (unpublished). The sole issue on appeal is whether it was error to deny Archuleta access to the disciplinary records of fellow police officers in his postdemotion hearing before the City's Grievance Review Board. We conclude that the denial of discovery was reasonable and did not deny Archuleta due process. We reverse the Court of Appeals and affirm the Board's decision.

## I.

{2} Archuleta was hired by the SFPD in 1991 and promoted to lieutenant in October, 1999. On June 7, 2000, he was the highest ranking officer in charge of the "grave-yard" shift at the North Side Division. One of his officers who was on duty that night was Issac Valerio. At 11:03 p.m. Valerio was flagged down by Evelyn Romero who reported that her seven year-old son, Robbie Romero, had been missing since 5:00 p.m.[1] Valerio entered the child's information into a national registry but never issued a bulletin or advisory notice; he then searched for the child throughout most of the night without success until his shift ended at 6:30 a.m. Although Valerio searched for the child for nearly seven hours, Archuleta never asked him about the case, provided additional resources, or notified an on-call detective as required by the SFPD's regulations. Archuleta claimed he was not aware that the case involved a missing seven year-old until 4:30 a.m. on June 8, although there was evidence that this

information was available to him at least twice during the night. Once he was aware of the situation, he did not take any action, even though a seven year-old had been missing for nearly twelve hours. Robbie was never found.

### A.

{3} Two supervisors, Captains Leroy Lucero and Andrew Leyba, requested that Internal Affairs investigate whether Archuleta and Valerio had complied with SFPD regulations. On September 20, 2000, after conducting a taped interview with Valerio and Archuleta and reviewing dispatch tapes, one of the investigators issued a report, in which he found that Archuleta violated two SFPD regulations: Patrol Investigative Procedure 13.G—failing to notify a CID commander of the missing seven year-old child upon being made aware of the case; and Administrative Order A–25.1—failing to "adequately supervise and direct the activities of personnel assigned to him and properly inspect their work for effectiveness, efficiency and adherence to established policies and procedure." Valerio was not faulted for failing to issue a bulletin or notice, because he was never given a copy of SFPD directives and Archuleta did not have a copy available for his team office. Valerio was exonerated on the charge that he failed to notify Archuleta about the missing child; dispatch tapes verified that at 11:03 he advised dispatch that he was flagged down about a missing person, at 11:39 he told dispatch that he was searching for the "seven year-old," and at 1:52 a.m. he asked Archuleta permission to travel outside the jurisdiction to La Cienega to search for the "seven year-old."

{4} Captains Lucero and Leyba then recommended that Archuleta be demoted to the rank of sergeant and attend "first line supervisor training" as an appropriate disciplinary action. Archuleta received notice of his predetermination hearing, which was held and recorded on September 28. Archuleta, who was represented by counsel, testified and questioned witnesses at this hearing. The next day, Chief Denko notified Archuleta

---

1. Officer Valerio wrote in the incident report that the child was reported missing since 7:00 p.m. but testified that Mrs. Romero actually told him her son had been missing since 5:00 p.m.

that he was approving the disciplinary action and of his right to appeal that decision. Archuleta provided a written response to the Personnel Director and the City Manager indicating that the action was excessive and unfair in light of SFPD's progressive discipline policy, and he described three cases in which he alleged other officers received lesser or equal punishment for more serious infractions. Both officials notified Archuleta that, after reviewing his information, they concurred with the recommendation that he be demoted, effective November 25, 2000.

## B.

{5} Archuleta appealed the action to the Board. A hearing officer was assigned to preside at the appeal hearing and issue recommendations to the Board. The hearing officer issued a letter setting forth the procedures for the hearing. Both parties would exchange witness and exhibit lists, submit position statements, and, as agreed by the parties, make witnesses available for brief, informal interviews and two depositions per side. The City bore the burden to prove, by a preponderance of the evidence, the basis for its discipline and the appropriateness of the discipline. Each side would be allowed to make opening and closing statements, call and cross-examine witnesses, introduce evidence, and invoke the rule allowing for the exclusion of witnesses from the hearing. Although the rules of evidence would not apply, the hearing officer reserved the right to exclude any evidence that was irrelevant, unduly burdensome, repetitive, harassing, or involving multiple hearsay.

{6} On May 17, 2001, five days before the hearing was initially set to begin, Archuleta moved for a continuance and to compel discovery from the City for "all prior cases involving the suspension, demotion or termination of an SFPD officer (of any rank) in the last five years, e.g. from 1996 to present." The City opposed the motion on the basis that the information was confidential, that the probative value was de minimis, and that it was irrelevant, overly broad, and unduly burdensome. A telephonic hearing was held off the record, after which the hearing officer denied the motion without explanation. The

parties submitted their position statements and objections to proposed exhibits.

{7} A hearing on the record was held on July 11, 12 and 13, 2001, during which the following evidence was elicited. As commander, Archuleta was required to direct and supervise all of the officers under his command, monitor their activity on the radio, allocate resources, review reports, and gather more information on pending cases, if necessary. Although Valerio had experience as a police officer, he was a recent-hire at SFPD and had been on his own for only three weeks. After responding to the Romero call on June 7, 2000, at 11:03 p.m., Valerio called in a "missing person" report to dispatch, reported that he would be searching for a "seven year-old," and entered the information into the national registry. Valerio searched for Robbie for about an hour-and-a-half until he took another call. He resumed his search for Robbie at 1:21 a.m.; by that time dispatch had changed the code for his report so that it indicated a runaway or a child in need of supervision, which had a lower priority. At 1:52 a.m., Valerio contacted Archuleta for permission to travel outside the jurisdiction to search for Robbie. The radio transmission indicates that Archuleta was told that Valerio was working on a case involving a runaway or a child in need of supervision and the "seven year old . . . may be in La Cienega . . . with a suspect in a case [involving the Romeros' daughter]." Archuleta told Valerio to take another officer with him; he did not inquire into the circumstances, apparently, because he did not hear the information about the seven year-old or that a possible suspect was involved in the disappearance. Valerio's search in La Cienega was unsuccessful, and he returned to Santa Fe at 3:06 a.m. for a meal break. He turned in his report to Archuleta at 4:27 a.m. Although Valerio was with Archuleta for twenty minutes, Archuleta made only a few minor spelling corrections to the report; he did not discuss the report, which clearly indicated that Valerio had been searching throughout the night for a seven year-old, or address several deficiencies in it. Valerio resumed his search from 4:49 to 6:30 a.m. Archuleta rejected Valerio's offer to continue his search until he was due in court at 9:00

a.m. and told him he would have another officer take over the investigation.

{8} For five and a half hours, from the time Robbie's disappearance was reported until Valerio turned in his report, Archuleta never asked Valerio about the incident or why he was spending so much time on it. Archuleta explained that he thought he was dealing with a runaway, which he considered a low priority. He testified that he first realized that Valerio had been searching for a missing seven year-old child at about 4:30 a.m., although he admitted that this information was relayed to him earlier—once by dispatch, which he was supposed to be monitoring, and once directly. After he discovered this information, he dismissed Valerio's requests to contact the media and search and rescue or canvass the neighborhood; his explanation was that he did not want to risk officer safety knocking on doors at 4:30 a.m. to look for a missing child, a circumstance he did not consider a "major case." He was unaware that SFPD regulations required him to notify an on-duty commander about any missing person or runaway report. At the end of his shift at 6:00 a.m., he left a "hot sheet" for the relieving shift lieutenant relaying information about several cases, including this case, rather than advising him about it when he spoke to the lieutenant by radio earlier in the morning or waiting to discuss it personally with him since the lieutenant was late for work. Archuleta testified that this was the way shift changes were handled and how lieutenants were notified of missing persons or runaways. He anticipated turning the report over for investigation later that morning when he returned to the station at 7:30 a.m. He simply did not see it as an urgent matter at 4:30 a.m.

{9} Archuleta testified that the shift that night was busy, although he admitted that he and other officers were available for large periods of time. He also testified about the manner in which other missing persons and runaway cases had been handled by SFPD and compared the handling of those cases with how the Romero case had been handled. He cross-examined witnesses about how two runaway cases were handled, one of which took place that same night. He expressed his opinion that other officers received lesser discipline for more egregious conduct, and he submitted a detailed description of three such instances.[2] He explained in detail other disciplinary actions against him by SFPD, as well as retaliatory actions that Captain Leyba allegedly had taken against him in the past. He testified that he was being unfairly blamed by SFPD for a possible murder, even though he felt nothing he could have done would have changed the outcome. On the other hand, he testified that if he had known that a seven year-old was missing at 2:00 a.m. or if he had asked Valerio about his investigation he would have done things differently. Archuleta admitted that he was to blame for the two-and-one-half-hour delay in handling this matter once he became aware of it.

{10} The hearing officer submitted his findings and recommendation to the Board on July 25, 2001, indicating that just cause existed for Archuleta's demotion and additional training. Shortly after, Archuleta submitted a detailed letter to the Board expressing his intent to "fully present his case and ... be available for questions" at the Board hearing and detailing his position that the demotion was not supported by just cause and violated SFPD's progressive discipline policy; he also contended it was error to exclude evidence of discipline levied against other SFPD officers. In a letter issued November 5, the Board stated that after meeting twice to review the exhibits and transcripts of the hearing, it found that the demotion and additional training were justified.

### C.

{11} Archuleta sought certiorari review of the Board's decision in the district court,

---

**2.** The record indicates that the hearing officer did not admit the summary of these three incidents into evidence, although it remained part of the record as exhibit 14. As mentioned elsewhere, Archuleta also submitted the summary in a letter to the Board after the hearing to support his argument that his discipline was excessive and in his Statement of the Case that was submitted to the hearing officer before the hearing. A redacted version was in his letter to the City Personnel Director.

arguing for the first time that the denial of discovery and exclusion of evidence pertaining to the discipline of other officers deprived him of due process and violated the Peace Officer's Employer–Employee Relations Act, NMSA 1978, § 29–14–6 (1991) (Peace Officer's Act). He further argued that the demotion was excessive, arbitrary, and capricious in that the City failed to follow its progressive discipline policy and the discipline was without just cause. The district court affirmed the Board's decision, holding that the demotion was based on substantial evidence. The court also held that ample due process was afforded Archuleta as he was allowed to call and cross examine witnesses at the hearing; the hearing officer did not violate due process in ruling that the discipline records of other officers were irrelevant and thus inadmissible. The court found that other issues were not supported by the facts or law.

{12} Archuleta raised the same issues in petitioning the Court of Appeals for certiorari review. The Court of Appeals held that Archuleta did not preserve the issue of whether the Peace Officer's Act was violated, and it did not reach the issue of whether his demotion was improper in light of the progressive discipline policy. *Archuleta*, No. 23,445, slip op. at 4, 10. Instead, the Court of Appeals reversed the district court and remanded the matter for further proceedings. Applying the constitutional due process balancing test, *see Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the court held that Archuleta's due process rights were violated when the board denied him "access to information concerning the discipline of other officers who had committed similar infractions of departmental policies and procedures." *Archuleta*, No. 23,445, slip. op. at 10. Consequently, "Archuleta was not afforded a fair opportunity to invoke the discretion of the Board on the appropriateness or the necessity of his demotion." *Id.* at 8–9.

{13} Judge Pickard dissented, pointing out that the request "sought masses of information," most of which was irrelevant to the extent that Archuleta sought to compare dissimilar violations for a wide-ranging propor-

tionality review. *Id.* at 12–13. In her view, the narrower issue was whether the hearing officer abused his discretion in refusing this request. *Id.* at 13. She concluded that the denial was reasonable, suggesting that the hearing officer properly balanced the need and relevance against the oppressiveness, breadth, and confidentiality of the request. *Id.* As for progressive discipline, she found that an employer ought to have a right to discipline by demotion employees who are charged with violating their supervisory duties. *Id.* at 14.

{14} The City petitioned this Court for certiorari, asking us to review whether the Court of Appeals erred in rewriting the discovery request, applying the *Mathews* test sua sponte, and holding that the denial of discovery violated Archuleta's due process rights. We address the City's request in two parts. We first consider whether the denial of discovery was arbitrary and capricious. We next consider whether Archuleta was denied due process. We conclude the district court correctly determined the Board's decision was neither arbitrary and capricious nor a violation of due process. We initially address, however, the appropriate standard of review.

## II.

{15} In limiting its analysis to Archuleta's due process rights, the Court of Appeals granted certiorari to correct a misapplication of the law. We granted certiorari to review that determination. The determination raises an issue of substantial public interest with respect to our review of administrative decisions. Rule 12–502(C)(4)(d) NMRA 2005. In determining whether the district court erred in the first appeal, we apply the same administrative standard of review as the district court sitting in its appellate capacity. *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, ¶ 16, 133 N.M. 97, 61 P.3d 806. "[W]e thus review the [Board's] order to determine if it is arbitrary, capricious, or an abuse of discretion; not supported by substantial evidence in the record; or, otherwise not in accordance with law." *Id.* ¶ 17;

**168**

*see* NMSA 1978, § 39–3–1.1(D) (1999); Rule 1–075(Q) NMRA 2005.

**{16}** The standard of review of an administrative order denying discovery seems to be a matter of first impression. There is a sound basis to afford substantial deference to an agency's ruling on such an order and reverse the ruling only for an abuse of discretion that is arbitrary or capricious or contrary to law. In judicial proceedings, we review discovery orders by a district court for an abuse of discretion. *Hartman v. Texaco Inc.*, 1997–NMCA–032, ¶ 20, 123 N.M. 220, 937 P.2d 979. Since administrative agency hearings are less formal than court proceedings, and agencies are ordinarily entrusted with judging the conduct and extent of discovery in the first place, courts generally review such determinations with extreme deference. *See Hi–Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 789 (D.C.Cir. 2000); *cf. Daniels v. Police Bd.*, 338 Ill. App.3d 851, 273 Ill.Dec. 524, 789 N.E.2d 424, 433 (2003), *appeal denied*, 205 Ill.2d 578, 281 Ill.Dec. 76, 803 N.E.2d 480 (2003) (discussing deferential review of a decision to consolidate disciplinary proceedings). *See generally* 16A Eugene McQuillin, *The Law of Municipal Corporations*, § 45.83, at 502 (3d ed., rev.vol. 2002) (discussing deferential review of administrative decisions for substantial evidence). We conclude the appropriate standard of review of the ruling on discovery is for an abuse of discretion. Since agency rulings must also be in accordance with the law, however, we believe the question of whether Archuleta was denied due process is a different issue and one for which a different standard of review is appropriate.

**{17}** "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Rio Grande Chapter of the Sierra Club*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. In viewing the whole record, and in evaluating the reasonableness of an action, we may take into account an agency's expertise. *See Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998–NMSC–020, ¶ 17, 125 N.M. 401, 962 P.2d 1236. We must be careful not to substitute our own judgment for that of the agency, when we are reviewing for arbitrary and capricious action. *Rio Grande Chapter of the Sierra Club*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. Generally, courts "should not attempt to 'supply a reasoned basis' " for an agency's decision, but "may 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " *Id.* ¶¶ 12–13 (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)) (quotation marks and additional quoted authority omitted).

**{18}** We review de novo whether a ruling by an administrative agency is in accordance with the law. *Clark v. N.M. Children, Youth & Families Dep't*, 1999–NMCA–114, ¶ 7, 128 N.M. 18, 988 P.2d 888. Although the Court is not bound by the agency's ruling on a matter of law, we nevertheless may take into account the nature of the agency and the scope of its power to determine fundamental policy. *See Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 120 N.M. 579, 583, 904 P.2d 28, 32 (1995). We should reverse the ruling if the agency unreasonably or unlawfully misinterprets or misapplies the law, but we may recognize agency expertise. *Id.*

{19} In this case, we first determine whether the denial of discovery was an abuse of discretion. Our inquiry is whether the decision was reasonable. In analyzing the Board's action, we recognize the City was legally authorized to determine and enforce disciplinary actions against its employees. Santa Fe, N.M., City Code § 19–3.4 (1998) ("It is the responsibility and exclusive prerogative of the city to direct its employees to take disciplinary action for proper cause ... and to determine the methods, means and personnel by which the city's operations are to be conducted."). We next review de novo whether due process required a different result. Again, but this time for a different reason, we take into account the City's interest in appropriate discipline.

**A.**

**{20}** The Santa Fe Municipal Code and the SFPD Rules and Regulations are

silent on whether employees are entitled to discovery in an administrative disciplinary proceeding. Section 29–14–6 of the Police Officers Act simply provides that "any peace officer ... under investigation for an administrative matter, ... shall be permitted to produce any relevant documents, witnesses or other evidence to support his case." [3] Therefore, in initially determining whether the denial of discovery was proper, we must determine whether the ruling was reasonable.

■■■■ {21} The technical rules of evidence and procedure often do not apply in an administrative hearing. *See, e.g., Gallagher v. Nat'l Transp. Safety Bd.*, 953 F.2d 1214, 1218 (10th Cir.1992) (citing the Administrative Procedures Act, 5 U.S.C. § 556(d) (2000)); *see also* NMSA 1978, § 10–9–18(A), (C) (1999) (providing that the rules of evidence do not apply to the termination, demotion, or suspension of state employees under the Personnel Act); NMSA 1978, § 12–8–11(A) (1969) (relaxing the rules of evidence under the New Mexico APA). The broad discretion accorded to an agency in conducting its hearings, however, "must be exercised judiciously and not arbitrarily." *Daniels*, 273 Ill.Dec. 524, 789 N.E.2d at 433. Although the federal and New Mexico Administrative Procedures Acts are not applicable, these acts are instructive on the issue of whether the denial of discovery in this case was reasonable. The rules of evidence are inapplicable or relaxed under both acts and certain otherwise objectionable evidence may be admitted, but both acts require the exclusion of irrelevant and immaterial evidence. *See Gallagher*, 953 F.2d at 1218; *see also* § 12–8–11(A). The rules of evidence are inapplicable in order to facilitate rather than hinder discovery and to allow a full opportunity to prepare. *Redman v. Bd. of Regents of the N.M. Sch. for the Visually Handicapped*, 102 N.M. 234, 238, 693 P.2d 1266, 1270 (Ct.App.1984). The exclusion of irrelevant and immaterial evidence is not inconsistent with relaxation of the rules of evidence.

{22} The hearing officer did not explain his decision denying the discovery Archuleta requested. The hearing was not recorded. Both the district court order and Archuleta's arguments, however, indicate that the decision was based on relevancy. We believe we can discern a reasonable basis for the ruling.

■■■ {23} Archuleta sought the discovery of "all prior cases involving the suspension, demotion or termination of any SFPD officer (of any rank) in the last five years." Thus, he was required to show how any discipline of any other employee under any other circumstances was relevant to his defense. *See State v. Roybal*, 115 N.M. 27, 30, 846 P.2d 333, 336 (Ct.App.1992) (holding that defendant failed to show information in internal affairs files was material to his defense). Archuleta has explained that evidence of other employees receiving less discipline for more egregious conduct would show that his demotion was excessive and contrary to a progressive discipline policy, which requires a minimum discipline before more serious sanctions are employed, i.e. oral reprimand, written reprimand, training, suspension, demotion, and then termination. Archuleta's request, however, was overly broad. *Cf. Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 209 F.R.D. 208, 214–15 (D.Kan.2002) (holding overly broad a request for " '[a]ny and all documents identifying all personnel hired and terminated at the [Genmar Kansas] plant between January 1999 to the present' " to show that similarly situated employees were treated differently than plaintiff) (alteration in original). "[A] party will not be required to respond to an overly broad discovery request unless adequate guidance exists as to what extent the request is not objectionable." *Id.* at 215. Even if the hearing officer knew what Archuleta actually sought to prove, the officer was not required to redraft the request. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 735–36 (3d Cir.1995) (stating that the district court can refuse to compel answers where the interrogatories are unsatisfactorily drafted or sug-

---

**3.** To the extent that Archuleta claims there is a statutory right to discovery, the Court of Appeals held that he failed to preserve this argument below. A review of the record supports that determination. Any reference to the Peace Officer's Act in this Opinion is not intended to be inconsistent.

gest the proper manner in which they should be asked, but it may not rewrite the discovery request). Further, the request gave the hearing officer no guidance in determining which cases were similar or more egregious. As Judge Pickard noted in her dissent, the City should not be subjected to a wholesale proportionality review of its disciplinary actions.

{24} Because the request was overly broad, it would have been reasonable for the hearing officer to conclude that the requested material had minimal if any probative value. This is a case of rather unique and serious circumstances involving a high ranking officer. Only truly analogous conditions with respect to performance, qualifications, and conduct would have been more than marginally relevant to the defense. *See Snipes v. Ill. Dep't of Corr.,* 291 F.3d 460, 463 (7th Cir.2002) (discussing a claim of retaliatory discharge and upholding the exclusion of evidence of disciplinary action against differently situated employees); *Archuleta,* slip op. at 6. For example, officers of "any rank" are not similarly situated to Archuleta, who was the sole commanding lieutenant in charge of an entire division of the SFPD graveyard shift. *See Kennedy v. Marion Corr. Inst.,* 69 Ohio St.3d 20, 630 N.E.2d 324, 328 (1994) (holding evidence of disparate treatment was inadmissible where officers under the disciplined supervisor's command were clearly not similarly situated). The reasons for "any suspension, demotion, or termination" would not necessarily be analogous to the circumstances in this case. *Cf. State v. Pohl,* 89 N.M. 523, 524, 554 P.2d 984, 985 (Ct.App. 1976) (compelling discovery of "all records of internal affairs investigations concerning allegations of police brutality or excessive use of force which have been filed against the arresting officer" where defendant's guilt or innocence hinged on whether the jury believed the arresting officer was the aggressor). Even similarly situated employees may be disciplined differently depending on the severity of the conduct and the consequences, the disciplinary history of the employee, and aggravating or mitigating factors. Further, a progressive discipline policy relates to the progression of discipline as it applies to the individual officer. A comparison of how oth-

er officers were disciplined does not appear to be more than marginally relevant.

{25} The hearing officer also could reasonably find that the requested material had no relevance in this matter. The record indicates the City was entitled to deviate from its progressive discipline policy if the misconduct justified more than the minimum applicable sanction. *See generally N.M. Regulation & Licensing Dep't v. Lujan,* 1999–NMCA–059, ¶ 19, 127 N.M. 233, 979 P.2d 744 (agreeing "that the State Personnel Board Rules require progressive discipline prior to dismissing an employee unless the employee is dismissed for just cause"). "[T]he State Personnel Board Rules acknowledge that there are instances where dismissal is appropriate prior to progressive discipline." *Id.* ¶ 15. SFPD's rules specify that just cause exists for "suspension or demotion or termination" when an officer demonstrates an inability to perform job requirements or whose actions reflect poorly on the integrity of the City. The rules also contemplate "individualized imposition of disciplinary action" and allow for the consideration of the "seriousness of the act or omission" in addition to the minimum applicable sanction. Thus, as in *Lujan,* the rules themselves appear to allow for deviation from progressive discipline depending on the surrounding circumstances of the misconduct. Based on our whole record review, we agree that there was sufficient evidence to support a deviation from the progressive discipline policy and thus to support demotion and additional training. *Regents of the Univ. of N.M.,* 1998–NMSC–020, ¶ 17, 125 N.M. 401, 962 P.2d 1236 (stating that when the court reviews an agency's findings, we look at evidence that is favorable to the decision and also unfavorable evidence when it would be unreasonable to ignore it; however, we must affirm the decision if it is supported by substantial evidence). On this basis we also conclude the hearing officer could have determined the requested material had no relevance.

■ {26} Archuleta was demoted because he failed to adequately supervise or respond in any way to a case involving a missing seven year-old who was never found and because he failed to notify an on-duty

detective commander about it. The hearing officer found that Archuleta never issued a bulletin; never personally looked for Robbie during the entire graveyard shift, even though he was available; never called for assistance or utilized the officers under his command in searching for the child; and never notified anyone in his chain of command about the missing child, so that his supervisors learned about it only from a "Hot Sheet," even though he was adequately informed by his subordinates and was responsible for knowing the significant and material facts. The hearing officer further found that, as the commander in charge, Archuleta failed to give sufficient attention to the case. He failed to react decisively, quickly, and appropriately in supervising and employing the resources available to him to conduct an investigation and search, in calling in additional resources if necessary, and in following Department policy, while exercising sound judgment and common sense. The evidence supports these findings.

{27} These facts demonstrated to the City that Archuleta lacked the experience, skill, and knowledge to be a watch commander and that he demonstrated poor judgment in handling a missing child report during the first critical hours of the case. The City considered alternative disciplines available under the rules. The City concluded that demotion and training were more appropriate than suspension because of the seriousness of the case, the manner in which it was handled, and the liability of the City if Archuleta remained in his position. The City chose not to terminate him, because there were no aggravating circumstances, and his employment record justified retention. The City's action was neither arbitrary nor capricious; it was not contrary to law. The evidence supports the hearing officer's conclusion that demotion and additional training were appropriate under SFPD rules.

{28} "Administrative agencies have considerable latitude to shape their penalties within the scope of their statutory authority, especially where a statute expressly author-

izes the agency to require that such action be taken as will effectuate the purposes of the act being administered." 2 Am.Jur.2d *Admin. Law* § 453, at 388 (2004); *see Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). "The relation of penalty to policy is peculiarly one for the administrative agency and its special competence...." Am.Jur.2d, *supra*, § 453, at 388; *accord Gen. Protective Comm. for Holders of Option Warrants of United Corp. v. Sec. & Exch. Comm'n*, 346 U.S. 521, 534, 74 S.Ct. 261, 98 L.Ed. 261 (1954). "The propriety of a disciplinary measure meted out by [an agency] is a matter of internal administration with which a court should not interfere absent a clear abuse of authority." *Long v. City of Wichita Falls*, 749 S.W.2d 268, 270 (Tex.App.1988).

{29} For these reasons, we conclude the hearing officer did not abuse its discretion in denying the discovery request. The request was overly broad and it sought material that had little or no relevance. We now turn to the due process analysis of the Court of Appeals.

**B.**

{30} The City argues that there is no constitutional right to discovery under federal or New Mexico law, and the unduly burdensome and costly result of such a rule would defeat even the most simple disciplinary proceeding. It also contends that it was unfair to apply *Mathews*; *Mathews* had not been raised earlier, and there was no record of the probable administrative burden and cost of such a broad, open-ended discovery order. Under these circumstances, the City contends the Court of Appeals did not give its interest in resisting discovery adequate weight. Archuleta claims that the City did not preserve its argument that there is no constitutional or other right to discovery in an administrative hearing. He also contends that the City has waived the issue since it agreed to allow some discovery below.[4] Nevertheless, he agrees with the Court of Appeals' due process analysis and argues that

---

4. We reject this argument. The agreement for discovery was limited to informal witness interviews and two depositions per side. This does

not constitute a waiver of a right to resist other discovery.

the City adequately raised the alleged problems regarding administrative burden and costs.

**{31}** Neither party's preservation arguments have merit. Since the due process question is an issue of law, appellate courts review the issue de novo. *Cordova v. LeMaster,* 2004–NMSC–026, ¶ 10, 136 N.M. 217, 96 P.3d 778. This means that appellate courts can and must apply the appropriate law. The *Mathews* test is the appropriate analytical framework for a due process issue. *City of Albuquerque v. Chavez,* 1998–NMSC–033, ¶ 13, 125 N.M. 809, 965 P.2d 928. Additionally, the City has suffered no harm; it has argued the administrative burden and costs issue in this appeal. We agree with the City that there is no constitutional right to pre-trial discovery in administrative hearings. *Lopez v. United States,* 129 F.Supp.2d 1284, 1289 (D.N.M.2000), *aff'd mem.,* No. 01–2090 (10th Cir. Nov. 15, 2001); *accord Dente v. State Taxation and Revenue Dep't,* 1997–NMCA–099, ¶ 6, 124 N.M. 93, 946 P.2d 1104, *overruled on other grounds by State Taxation & Revenue Dep't v. Bargas,* 2000–NMCA–103, 129 N.M. 800, 14 P.3d 538. This general rule, however, is not dispositive. *See Dente,* 1997–NMCA–099, ¶ 8, 124 N.M. 93, 946 P.2d 1104 ("[I]n some cases, due process might require that depositions be allowed in order to afford a party a meaningful opportunity to prepare."). Administrative hearings that affect a property or liberty interest must comply with due process. The *Mathews* test determines what process is due in a particular hearing. *Chavez,* 1998–NMSC–033, ¶ 13, 125 N.M. 809, 965 P.2d 928. " 'Due process is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews,* 424 U.S. at 334, 96 S.Ct. 893 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)) (alteration omitted).

**{32}** "[C]onstitutional due process does not require an agency to afford a petitioner all elements of a traditional judicial proceeding." *Miller v. County of Santa Cruz,* 796 F.Supp. 1316, 1319 (N.D.Cal.1992), *aff'd,* 39 F.3d 1030 (9th Cir.1994). "In general, the right to due process in administrative proceedings contemplates only notice of the opposing party's claims and a *reasonable* opportunity to meet them." *Dente,* 1997–NMCA–099, ¶ 4, 124 N.M. 93, 946 P.2d 1104 (emphasis added). The importance of the individual's and administrative body's interests, together with "the risk of an erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," dictates what additional process, if any, is due in an administrative proceeding. *Chavez,* 1998–NMSC–033, ¶ 14, 125 N.M. 809, 965 P.2d 928 (quoting *Mathews,* 424 U.S. at 335, 96 S.Ct. 893) (emphasis omitted).

**{33}** SFPD rules expressly create a "property right" that entitles the employee to an appeal and a hearing in any disciplinary action. The Court of Appeals concluded that Archuleta had a "weighty interest" in his "expectation of continued employment with [SFPD], in good standing and in the capacity of a lieutenant." *Archuleta,* No. 23,445, slip op. at 5. Other jurisdictions, however, do not attribute as much weight to the individual's interest with respect to a demotion as compared to a termination. *DelSignore v. DiCenzo,* 767 F.Supp. 423, 427 (D.R.I.1991); *Williams v. City of Seattle,* 607 F.Supp. 714, 720 (W.D.Wash.1985). From a property standpoint, an employee who has been demoted suffers a loss in pay or benefits. *Williams,* 607 F.Supp. at 720. Although a decrease in pay or benefits is of significance, it may be relatively insubstantial and is a less compelling deprivation than a termination. *DelSignore,* 767 F.Supp. at 427. We conclude that Archuleta's interest was less compelling than the Court of Appeals indicated.

**{34}** The Court of Appeals also concluded that the risk of an erroneous deprivation was great because the materials were critical to his defense, and the probable value of compelling discovery was high. *Archuleta,* No. 23,445, slip op. at 5–7. The court relied on several cases in which our courts have considered evidence of disparate discipline in their review for substantial evidence. These cases are distinguishable. For example, in one case there was no evidence to support a finding of just cause for termination, and evidence of disparate treatment in directly analogous cases simply supported that deter-

mination. *See Kibbe v. Elida Sch. Dist. (In re Termination of Kibbe),* 2000–NMSC–006, ¶¶ 14–17, 128 N.M. 629, 996 P.2d 419. In another, there was no meaningful standard by which to review the just cause determination, and similarly situated employees had not been terminated. *N.M. State Bd. of Educ. v. Stoudt,* 91 N.M. 183, 186–87, 571 P.2d 1186, 1189–90 (1977) (per curiam). The evidence was relevant but not "critical" in these cases.[5] The relevancy of "all prior cases involving the suspension, demotion or termination of any SFPD officer (of any rank) in the last five years" is not so apparent. We have noted in the past that a "board's decision not to impose disciplinary action against an employee for certain conduct does not foreclose disciplinary action against a different employee in the future for similar conduct." *In re Termination of Kibbe,* 2000–NMSC–006, ¶ 17, 128 N.M. 629, 996 P.2d 419.

{35} The Court of Appeals opinion also gives too little weight to the extent of the City's efforts to determine the facts of the incident in question, as well as the extent to which Archuleta availed himself of the procedures that were in place to prevent bias or pretext from entering into the decision-making process. *See Chavez,* 1998–NMSC–033, ¶ 14, 125 N.M. 809, 965 P.2d 928 ("[A]ssessing the risk of such error requires us to consider the pre—and post-termination proceedings as a whole."). Two supervisors requested Internal Affairs to investigate Archuleta's conduct; the investigation was completed, and both supervisors recommended demotion and training. A predetermination hearing was held in which Archuleta was represented by counsel, allowed to testify, introduce evidence, and cross examine witnesses. The recommendation was approved by the Chief, the Personnel Director, and the City Manager only after they reviewed all of that evidence. Archuleta appealed their decision to the Grievance Board and an impartial hearing officer was assigned to the case. Archuleta was afforded a full post-determination hearing on the rec-

ord, with counsel, and he had a reasonable opportunity to present his case. He was given all the materials that were used against him and he was allowed to conduct informal interviews, as well as two depositions. Archuleta vigorously argued his position at both hearings, including his personal history with Captain Leyba and the disparate treatment he perceived, including three cases that he brought to the Board's attention. The Board carefully reviewed all of this material and affirmed the demotion and training. Archuleta then obtained judicial review in district court, which affirmed the decision. In light of the foregoing, the probable value of the requested materials was minimal, and Archuleta cannot claim any specific prejudice from the denial of discovery in this case. *See Dente,* 1997–NMCA–099, ¶ 8, 124 N.M. 93, 946 P.2d 1104 (finding plaintiff had ample opportunity to cross-examine and alleged no specific prejudice from the lack of an opportunity to take depositions prior to his administrative hearing).

{36} Finally, the Court of Appeals held that the City's interest in confidentiality was not sufficiently substantial, because the files could have been reviewed in camera and private information redacted. *Archuleta,* No. 23,445, slip op. at 7–8. Nevertheless, the City has a substantial and compelling interest in managing the internal affairs of its police department "to maintain the discipline, morale, and effectiveness of the department." *Williams,* 607 F.Supp. at 720. That interest is illustrated by the facts of this case. The City had an interest in removing a police officer from a supervisory position to prevent him from engaging in future negligent conduct and dereliction of duty where public safety and the City's liability would be at risk. This interest is sufficiently compelling to shield the City from an overly broad discovery request that would be of little or no probative value. We note, as well, the City's interest in "the fiscal and administrative burdens that the additional or substitute proce-

---

5. In one other case, the court evaluated disparate treatment for the same misconduct arising out of the same incident where there was no evidence to support such treatment. *Gallegos v. N.M. State Corr. Dep't,* 115 N.M. 797, 802, 858 P.2d 1276, 1281 (Ct.App.1992). Here, Officer Valerio was exonerated.

dural requirement would entail." *Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

### III.

{37} For these reasons, we reverse the Court of Appeals decision that Archuleta was entitled to discovery in this case. The deprivation was not so compelling and the risk of error so grave or the probable value of the material so substantial that it outweighed the City's very substantial interests in effectively and efficiently disciplining its employees. The hearing officer acted reasonably in denying the request for discovery, and the district court did not err in concluding the Board had not acted arbitrarily or capriciously. We do not remand Archuleta's remaining claim that the City violated its progressive discipline policy because that issue has been necessarily decided in our resolution of the questions presented on certiorari. *Cf. State v. Javier M.,* 2001–NMSC–030, ¶ 10, 131 N.M. 1, 33 P.3d 1. We affirm the order of the district court upholding the Board's decision.

{38} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PATRICIO M. SERNA, and EDWARD L. CHÁVEZ, Justices.

Justice PETRA JIMENEZ MAES recused.