Certiorari Denied, June 21, 2010, No. 32,407
Certiorari Denied, June 21, 2010, No. 32,408

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMCA-065

Filing Date: April 19, 2010

Docket No.  28,746

consolidated with

Docket No.  28,747

BASS ENTERPRISES PRODUCTION COMPANY,

      Respondent-Appellant,

and

THE PATSY MILLS BAKER GST TRUST,
THE PATSY MILLS BAKER 2005 GST TRUST,
THE JIMMY MILLS GST TRUST,
THE JIMMY MILLS 2005 GST TRUST,
THE BRETT EVERETT LONGLEY TRUST, and
THE WILLIAM JOSEPH LONGLEY TRUST,

      Intervenors-Appellants,

v.

MOSAIC POTASH CARLSBAD INC.

      Intervenor-Petitioner,

Consolidated with

DEVON ENERGY PRODUCTION COMPANY, L.P.,

      Respondent-Appellant,

v.

MOSAIC POTASH CARLSBAD INC.,

**Intervenor-Petitioner.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Daniel A. Sanchez, District Judge**

Holland & Hart, LLP
William F. Carr
Michael H. Feldewert
Larry J. Montano
Ocean Munds-Dry
Jacqueline Davis
Kristina Elena Martinez
Santa Fe, NM

for Appellants Bass Enterprises Production Company
and Devon Energy Production Company, L.P.

Hinkle, Hensley, Shanor & Martin, L.L.P.
Andrew J. Cloutier
Roswell, NM

for Appellants Patsy Mills Baker GST Trust, et al.

Comeau, Maldegen, Templeman & Indall, LLP
Joseph E. Manges
Santa Fe, NM

Kemp Smith LLP
Charles C. High, Jr.
Clara B. Burns
El Paso, TX

for Appellee Mosaic Potash Carlsbad Inc.

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Larry P. Ausherman
Adam H. Greenwood
Albuquerque, NM

for Intervenor-Petitioner Intrepid Potash-New Mexico LLC

**OPINION**

**ROBLES, Judge.**

**{1}**     The issue before us in this appeal is whether the New Mexico Oil Conservation Commission (OCC) properly denied two Applications for Permits to Drill (APDs) oil and gas wells in Eddy County, New Mexico. The APDs were filed by Bass Enterprises Production Company (Bass) and Devon Energy Production Company, L.P. (Devon) (collectively, Applicants) and were opposed by Mosaic Potash Carlsbad Inc. (Mosaic). Applicants appealed the OCC's orders to the district court, who ultimately reversed the orders, holding that they were not supported by substantial evidence, were not in accordance with law, and were arbitrary and capricious. Mosaic petitioned this Court for a writ of certiorari in each case, which we granted. We have consolidated the two cases and, after reviewing the record, amicus briefs, and the arguments of the parties, we conclude that there was substantial evidence to support the OCC's orders, they were in accordance with the law, and they were not arbitrary or capricious. Accordingly, we reverse the district court and remand with instructions to affirm the original orders of the OCC denying the APDs.

## I.     BACKGROUND

**{2}**     The OCC was created by NMSA 1978, Section 70-2-4 (1987) of the Oil and Gas Act (Act). *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 2, 146 N.M. 24, 206 P.3d 135. Under the Act, the OCC is charged with preventing the waste of potash resources and oil and gas and, in this regard, it is given specific powers and jurisdiction to regulate the drilling of oil and gas under certain circumstances. Pursuant to this power, on April 21, 1988, the OCC adopted Order No. R-111-P, in which it defined a geographical area called the "Potash Area" and established rules pertaining to potash, oil, and gas development within that area. Order No. R-111-P(B). This area was to be "coterminous" with the "Known Potash Leasing Area" (KPLA), which is defined by the Bureau of Land Management (BLM). *See Oil, Gas & Potash Leasing & Dev. Within the Designated Potash Area of Eddy & Lea Counties, N.M.*, 51 Fed. Reg. 39425-01 (Oct. 28, 1986) (defining the KPLA and resigning to cooperation with the OCC in implementation of OCC's rules and regulations and specifically acknowledging Order No. R-111-P as amended).

**{3}**     The OCC noted in Order No. R-111-P(3) that there had previously been confusion regarding boundaries of potash leasing areas, and the oil and gas industry and the potash industry had demonstrated a "lack of tolerance" in areas where both industries had interests. It determined that a system was needed to prevent overlapping extraction of resources because oil and gas production could release methane into a potash mine, which would endanger the lives of miners and would make further mining uneconomic because expensive safety upgrades would be required in order for the mines to remain compliant under the Mine Safety and Health Administration (MSHA) of the United States Department of Labor. Order No. R-111-P(13).

**{4}**     Further, Order No. R-111-P was based off of an agreed compromise by both industries that created a process for prohibiting oil and gas drilling in areas where doing so would waste potash, and a copy of that agreement was attached to Order No. R-111-P as an

exhibit. Order No. R-111-P(4)-(12); Exhibit B. Under the agreement, "potash operators relinquish[] lower grade marginal or uneconomic ore deposits in order to more fully protect their higher grade ore deposits[,] and the oil/gas operators receiv[e] such lands containing sub-economic ore deposits as prospective drill[]sites." Order No. R-111-P(9). The OCC found that "in the interest of preventing waste of potash [the OCC] should deny any application to drill in commercial potash areas as recommended in the work committee report, *unless a clear demonstration is made that commercial potash will not be wasted unduly* as a result of the drilling of the well." Order No. R-111-P(20) (emphasis added).

**{5}**     Under Order No. R-111-P(G), a potash lessee is allowed to file a designation of an area constituting its Life of Mine Reserves (LMR) with the BLM for federal lands and with the State Land Office (SLO) for state lands. An LMR designation represents acknowledged deposits of potash within the potash area that are "reasonably believed . . . to contain potash ore in sufficient thickness and grade to be mineable using current day mining methods." Order No. R-111-P(G)(a). The designation is subject to approval by officers of the BLM and SLO. *Id*. An oil and gas operator, proposing to drill on state or fee lands within the KPLA, is required to give notice to all potash lessees of lands within one mile of the proposed drill site. Order No. R-111-P(G)(2). Order No. R-111-P(G)(3) provides that applications to drill on state or fee lands within a potash LMR, or within a buffer zone of one-quarter mile for shallow wells, or one-half mile for deep wells surrounding an LMR, "may be approved only by mutual agreement of lessor and lessees of both potash and oil and gas interests." *Id*.

**{6}**     In Eddy County, there are tracts of fee land that are within the potash area. *See generally* Order No. R-111-P. Applicants' APDs pertain to land located in this checkerboard area.

**{7}**     In the case of Bass, the land in question was on a forty-acre tract of fee land owned by Stacy Mills and others. In Devon's case, the land was also a forty-acre tract owned by Kenneth Smith and his family. The APDs were filed with the OCD as required by statute and order of the OCC. *See generally* NMSA 1978, §§ 70-2-1 to -38; Order No. R-111-P. Bass sought the approval for a well, known as the James Ranch Unit Well No. 93, proposed on the Mills' parcel. Devon sought approval for two wells, both on the Smiths' parcel located in the potash area of Eddy County. The APDs were opposed by Mosaic, who had an LMR in Section 7, not including the forty-acre tract owned by the Mills family, and LMRs in Sections 23 and 24, not including the forty-acre tract owned by the Smith family. The APDs were ultimately approved by the OCD.

**{8}**     Pursuant to Section 70-2-13, Mosaic timely applied to have the matters reheard de novo before the OCC, and the APDs were consolidated and heard together, at which time, all parties were permitted to call witnesses, present exhibits, and cross-examine witnesses. Subsequently, the OCC issued Order No. R-12402-A in the Bass case, and Order No. R-12403-A in the Devon case, both of which denied Applicants' APDs. Applicants filed motions for rehearing with the OCC, which were deemed denied when they were not acted upon within ten days. *See* NMSA 1978, § 70-2-25(A) (1999). Applicants appealed the

OCC's orders to district court pursuant to Section 70-2-25(B) and NMSA 1978, Section 39-3-1.1 (1999). Mosaic petitioned the district court to intervene as an interested party and to join the OCC in defense of the OCC's orders, and the district court granted the motion. Oral arguments on both cases were heard together. The district court issued separate memorandum decisions concluding that, in both cases, the OCC's orders lacked substantial evidence, were arbitrary and capricious, were not in accordance with the law, and were therefore invalid and void. The OCC has decided not to participate in this appeal, and we have allowed briefing by the Mills family as intervenors.

## II.    DISCUSSION

**{9}**    "[J]udicial review of administrative action . . . requires a determination whether the administrative decision is arbitrary, unlawful, unreasonable, capricious, or not based on substantial evidence." *Regents of Univ. of N.M. v. Hughes*, 114 N.M. 304, 309, 838 P.2d 458, 463 (1992). "This Court applies the same statutorily defined standard of review as the district court." *Miller v. Santa Fe Bd. of County Comm'rs*, 2008-NMCA-124, ¶ 16, 144 N.M. 841, 192 P.3d 1218 (alteration omitted) (internal quotation marks and citation omitted). Accordingly, we review the OCC's orders in concert with the record.

### A.    Accordance with the Law

**{10}**    On appeal, Applicants argue that (1) the OCC incorrectly placed the burden on them; (2) the OCC's decision represented a departure from the prior decisions; and (3) the OCC had a duty to balance the competing interests of oil, gas, and potash operators. We address each issue in turn.

**{11}**    A ruling that is not in accordance with the law should be reversed "if the agency unreasonably or unlawfully misinterprets or misapplies the law." *Archuleta v. Santa Fe Police Dep't ex rel. City of Santa Fe*, 2005-NMSC-006, ¶ 18, 137 N.M. 161, 108 P.3d 1019. An agency's interpretation of a statute that governs it will be given some deference by this Court. *Marbob Energy Corp.*, 2009-NMSC-013, ¶ 6. "We are not bound by an agency's interpretation of a statute, since it is a matter of law that is reviewed de novo." *N.M. Mining Ass'n v. N.M. Water Quality Control Comm'n*, 2007-NMCA-010, ¶ 11, 141 N.M. 41, 150 P.3d 991 (filed 2006). "Rules, regulations, and standards that have been enacted by an agency are presumptively valid and will be upheld if reasonably consistent with the authorizing statutes." *Id*.

**{12}**    When presented with a question of statutory construction, we observe the following general principles: (1) the plain language of the statute is the primary indicator of legislative intent; (2) we will not read into a statute language which is not there, particularly if it makes sense as written; (3) we will give persuasive weight to long-standing administrative constructions of statutes by the agencies charged with administering them; and (4) when several sections of a statute are involved, they must be read together, so that all parts are given effect. *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶

4

5, 126 N.M. 413, 970 P.2d 599. If the plain language of a statute creates an unreasonable or absurd result, we will reject the literal language. *Phelps Dodge Tyrone, Inc. v. N.M. Water Quality Control Comm'n*, 2006-NMCA-115, ¶ 15, 140 N.M. 464, 143 P.3d 502. The main goal of statutory construction is to give effect to the intent of the Legislature. *N.M. Mining Ass'n*, 2007-NMCA-010, ¶ 12. "We also consider the history and background of the statute, as we harmonize the language in a manner that facilitates the operation of the statute and the achievement of its goals. Agency rules are construed in the same manner as statutes." *Id*. (citation omitted).

## 1.     Burden of Production

**{13}**     As an initial matter, we clarify a point of contention between the parties. In their briefs, both sides dispute as a matter of law who should have had the burden at the OCC hearing. Both sides, however, agree that the OCC placed the burden on Applicants. This was the correct approach.

**{14}**     Under Section 70-2-3(F), "waste" is clearly defined as "drilling or producing operations for oil or gas within any area containing commercial deposits of potash where such operations would have the effect unduly to reduce the total quantity of such commercial deposits." *See* § 70-2-12(B)(17) ("[T]he [OCD] is authorized . . . to regulate and, where necessary, prohibit drilling or producing operations for oil or gas within any area containing commercial deposits of potash where the operations would have the effect unduly to reduce the total quantity of the commercial deposits of potash."). It was directly pursuant to this power that the OCC adopted Order No. R-111-P(G)(3), which states, in pertinent part:

> Any application to drill in the LMR area, including buffer zones, may be approved only by mutual agreement of lessor and lessees of both potash and oil and gas interests. Applications to drill outside the LMR will be approved as indicated below[:]
>
> (a)     a shallow well shall be drilled no closer to the LMR than one-fourth (1/4) mile or 110% of the depth of the ore, whichever is greater.
>
> (b)     A deep well shall be drilled no closer than one-half (1/2) mile from the LMR.

**{15}**     The order further notes that the area described in Exhibit A, which is attached to the order, represents the potash area, which is analogous to the BLM's/KPLA designation. Order No. R-111-P(B). Within these areas, a potash lessee "shall file with the District Manager, BLM, and the [SLO], a designation of the potash deposits considered by the potash lessee to be its [LMR]." Order No. R-111-P(G)(a). An LMR "means those potash deposits within the Potash Area reasonably believed by the potash lessee to contain potash ore in sufficient thickness and grade to be mineable using current day mining methods,

equipment[,] and technology." *Id.* When an oil and gas operator proposes to drill on state land within the potash area, Order No. R-111-P(G)(3) requires the operator to submit an application with the OCD, who, in collaboration with the SLO, "will first ascertain . . . that the location is not within the LMR area." *Id.*

**{16}** However, Order No. R-111-P(20) contains an exception for oil and gas operators:

> The Commission cannot abdicate its discretion to consider applications to drill as exceptions to its rules and orders but in the interest of preventing waste of potash should deny any application to drill in commercial potash areas as recommended in the work committee report, unless a clear demonstration is made that commercial potash will not be wasted unduly as a result of the drilling of the well.

**{17}** When read together, Order No. R-111-P clearly envisions a framework where an oil and gas operator must submit an application to drill and, if the proposed site is within an LMR or buffer zone and the holder of that LMR or buffer zone does not consent to the proposed drilling, the applicant has the burden to demonstrate that the proposed well qualifies as an exception to the OCC's rules and orders. Indeed, OCC's previous interpretation of Order No. R-111-P in *Yates Petroleum Corp.*, Order No. R-9650 dated March 20, 1992, and Order No. R-9651-A dated August 23, 1993, supports this proposition. In that case, the oil and gas operator sought permission to drill within a potash operator's LMR buffer zone. Order Nos. R-9650 and R-9651-A(3)-(6). The OCC concluded in its interim order that Order No. R-111-P placed the burden on the applicant.

> When the designation of an LMR by a [p]otash operator may prevent an oil and gas operator from accessing its property, the oil and gas operator must be given the opportunity to review the geologic basis for the designation, with appropriate restrictions to protect the confidentiality of the data, in order to make a meaningful challenge.

Order Nos. R-9650-A and R-9651-A(7).

**{18}** In *Yates Petroleum Corp.*, in subsequent Order Nos. R-9650-B and R-9651-B(8) dated February 10, 1994, the OCC further clarified that:

> Order No. R-111-P requires that . . . any drilling application within an LMR or its buffer zone may be approved only with the agreement of the potash operator . . . [and e]xceptions from NMOCC Order No. R-111-P will only be granted if an oil and gas operator can show that a well within an LMR or its buffer zone will not waste potash or a potash operator can show that a well outside an LMR and its buffer zone will waste potash.

6

**{19}**     Because the applicant in *Yates Petroleum Corp.* was proposing to drill within the buffer zone of a potash operator's LMR, the OCC concluded that the "applications to drill should be denied unless the drilling and production of the wells will not waste potash." Order Nos. 9650-B and 9651-B(13). In the instant case, all three of the proposed wells were within Mosaic's LMR buffer zones, thus putting the burden on Applicants to demonstrate that the proposed wells would not waste potash, or to get permission from Mosaic whose buffer zone would be impacted by the proposed well.

## 2.     The OCC's Prior Decisions

**{20}**     Applicants argue that, although they submitted their applications subject to Order No. R-111-P, OCC's decision is a departure from its prior interpretation of that order and the statutes that govern the agency. Citing to *Hobbs Gas Co. v. New Mexico Public Service Commission*, 115 N.M. 678, 680-81, 858 P.2d 54, 56-57 (1993), Applicants correctly argue that an agency is not free to arbitrarily disregard its own rules and prior decisions. Applicants claim that prior OCC decisions have interpreted the agency's statutory duty and Order No. R-111-P to stand for the proposition that, if there is an agreement to drill for oil or gas reserves among all the owners of the reserves and the potash in a tract of land, approval must be given. Essentially, Applicants are stating that, although the proposed drilling locations are within Mosaic's buffer zone, the forty-acre tracts in question are on fee land where the Mills and the Smiths own the rights to all potash, oil, and gas reserves, and their agreement to let Applicants drill is sufficient for approval of the APDs.

**{21}**     Applicants cite to *Noranda Minerals, Inc.*, Order No. R-9990 dated October 18, 1993, to support their proposition. In that case, the oil and gas operator had applied for a permit to drill in the potash area/KPLA as designated in Order No. R-111-P(8). Although the proposed well location was within the buffer zone as declared and reflected in the potash operator's LMR, it was on fee land as is this case. Order No. R-111-P(12)-(14). The APD was approved because the owner of the fee land had consented to the oil and gas operator drilling and because Order No. R-111-P(G)(3) provides that "application to drill in the LMR area, including buffer zones, may be approved only by mutual agreement of lessor and lessees of both potash and oil and gas interests." We are not persuaded by Applicants' argument.

**{22}**     First, we note that Order No. R-9990 was an order of the OCD and, therefore, has no precedential effect on the OCC. Second, although the OCD issued a staying order, so that the case could be reviewed by the OCC in a de novo hearing, the OCC did not hold a hearing in *Noranda Minerals*. *See* Order No. R-9990-A dated December 3, 1993 (staying the APD); Order No. R-9990-B dated April 18, 1994 (accepting a "Motion to Dismiss Application for De Novo Hearing and to Dissolve Stay of OCD Examiner Decision"). The OCC has not made a previous determination sufficiently analogous to the immediate case, such that it could be said that the current decision is a departure from past precedent. The *Noranda Minerals* case is not binding on the OCC, nor is it binding on this Court. Finally, our own review of Order No. R-111-P and the OCC's statutory mandate leads us to conclude that the

7

type of mandatory permission to drill based on consent that Applicants argue for without concern for waste of potash or the LMR holder's safety or interests would defeat the purpose of having an LMR designation with accompanying buffer zone. Order No. R-111-P(G)(3) states that an APD within an LMR or buffer zone "may be approved only by mutual agreement of lessor and lessees of both potash and oil and gas interests." In the immediate case, the potash lessee, Mosaic, simply did not agree to oil and gas drilling within its buffer zone. Absent Mosaic's consent, Applicants' proper course of action was to seek an exception to the OCC's rules and orders. *See* Order No. R-111-P(20).

### 3.    Correlative Rights

**{23}**    Applicants also argue that the OCC failed to balance the interests of oil and gas operators against the interests of potash operators, and the denial of the APDs impaired correlative rights. We review this argument in light of the relevant statutes in order to determine what duty the OCC has to balance those interests and to what extent it applies here. Section 70-2-6(A) confers on the OCD the authority "over all matters relating to the conservation of oil and gas and the prevention of waste of potash as a result of oil or gas operations in this state." As discussed earlier, the Legislature has defined the OCC's duties under the Act. The OCC is directed to prevent the waste of potash resources, as well as the waste of oil and gas. § 70-2-2 (prohibiting waste); § 70-2-3(A), (F) (defining waste as the "operating or producing[] of any well . . . in a manner to reduce or tend to reduce the total quantity of crude petroleum oil or natural gas ultimately recovered" and "drilling or producing operations for oil or gas within any area containing commercial deposits of potash where such operations would have the effect unduly to reduce the total quantity of such commercial deposits of potash which may reasonably be recovered"). However, Section 70-2-12(B)(17) provides the OCC with the explicit power

> to regulate and, *where necessary, prohibit drilling or producing operations for oil or gas* within any area containing commercial deposits of potash where the operations would have the effect unduly to reduce the total quantity of the commercial deposits of potash that may reasonably be recovered in commercial quantities or where the operations would interfere unduly with the orderly commercial development of the potash deposits.

(Emphasis added.)

**{24}**    Conversely, the Legislature has defined "correlative rights" to mean:

> [T]he opportunity afforded, so far as it is practicable to do so, to *the owner of each property in a pool* to produce without waste his just and equitable share of the *oil or gas or both in the pool*, being an amount, so far as can be practically determined and so far as can be practically obtained without waste, substantially in the proportion that the quantity of recoverable oil or gas or both under the property bears to the total recoverable oil or gas or both

8

in the pool and, for such purpose, to use his just and equitable share of the reservoir energy.

NMSA 1978, § 70-2-33(H) (2004) (emphasis added).

**{25}** When read together, we are not convinced the OCC is required to ensure that holders of potash rights and holders of oil and gas rights are entitled to retrieve their equitable share of the resources in a given area. Order No. R-111-P acknowledges that, at times, it may be possible to retrieve only potash or only oil and gas from a given area. *See* Order No. R-111-P(11)-(16) (noting that release of methane into potash mines may endanger lives of miners and waste potash). The OCC's orders in this case specifically recognized that the purpose of the buffer zones in Order No. R-111-P was to prevent methane releases into mines, and "[d]rilling for oil and gas after potash mining has occurred is difficult, if not impossible, because of the caverns created during the potash ore's extraction," and "the development of either oil or gas or potash has the potential to make the development of the other much more difficult." Order No. R-12402-A(9), (10), (12), (13); Order No. R-12403-A(9), (10), (12), (13).

**{26}** However, Applicants correctly point to the language in Section 70-2-12(B)(17) that allows the OCC to prohibit drilling "where the [oil and gas] operations would have the effect unduly to reduce the total quantity of the commercial deposits of potash that may reasonably be recovered." We agree that this language within the frame work of the Act does require the OCC to examine the competing interests for resources and make a determination whether a proposed well would unduly impact potash development.

**{27}** In this particular case, a review of the record and the orders of the OCC, which we will develop later in this Opinion, lead us to conclude that Applicants' interests were considered and addressed by the OCC when it concluded that Applicants had alternative methods available to them for developing the oil and gas resources. We therefore hold that the OCC acted in accordance with the law when it denied Applicants' APDs because the OCC did not unreasonably or unlawfully misinterpret or misapply its authorizing and guiding statutes or depart from its prior interpretations, rules, or orders.

**B.     Substantial Evidence**

**{28}** On appeal, the district court may not substitute its judgment for that of the administrative agency and is instead restricted to consider whether the administrative body's decision is substantially supported by evidence in the record. *Elliott v. N.M. Real Estate Comm'n*, 103 N.M. 273, 275, 705 P.2d 679, 681 (1985). On appeal to this Court, we review the administrative decision in the same manner as the district court. *Archuleta*, 2005-NMSC-006, ¶ 15. Additionally, our review requires deciding whether the district court was correct in its assessment of whether substantial evidence supported the administrative body's order. *Snyder Ranches, Inc. v. Oil Conservation Comm'n*, 110 N.M. 637, 639, 798 P.2d 587, 589 (1990). Therefore, "we must independently examine the entire record." *Nat'l*

*Council on Comp. Ins. v. N.M. State Corp. Comm'n*, 107 N.M. 278, 282, 756 P.2d 558, 562 (1988). For purposes of reviewing administrative decisions, the substantial evidence rule is modified to include whole record review. Under whole record review, evidence is viewed in a light most favorable to upholding the agency's determination, but favorable evidence is not viewed in a vacuum that disregards contravening evidence. *Santa Fe Exploration Co. v. Oil Conservation Comm'n of N.M.*, 114 N.M. 103, 114, 835 P.2d 819, 830 (1992). "The reviewing court needs to find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Snyder Ranches, Inc.*, 110 N.M. at 639, 798 P.2d at 589 (internal quotation marks and citation omitted).

**{29}** Mosaic asserts that, in each case, the OCC denied the APDs for essentially three reasons: (1) approval would waste potash, (2) Applicants had alternative means to develop the oil and gas reserves, and (3) each proposed deep well was within one-half of a mile of Mosaic's LMR and, therefore, was prohibited by Order No. R-111-P. This is an accurate summary of the two relevant orders of the OCC: Order No. R-12402-A and Order No. R-12403-A.

**1.    The Case for Bass**

**{30}** In Order No. 12402-A, the OCC made the following findings:

> 40.    Within a one-half mile radius of the proposed . . . Well No. 93[,] there would be an additional 0.66 million tons of 4½ percent potash wasted with a value of $11 million beyond the potash wasted because of the drilling of the previous wells.

> 41.    The estimated waste caused by . . . Well No. 93 only includes the potash that would be wasted within the one-half mile radius of the well. It does not include the additional known deposits of mineable potash ore south and east of the WIPP site. The federal government has withdrawn the WIPP site from potash development[,] and it is therefore not available as access to the areas to its south and east. Therefore, these areas would become inaccessible due to the location of the proposed . . . Well No. 93, which would be in the center of the only path to these ores.

> 42.    Given that the proposed . . . Well No. 93 is located in measured potash ore and would prevent the mining of not only the 0.66 million tons of 4½ percent ore within a one-half mile radius of the proposed well[,] but would also prevent access to potash ore deposits south and east of the WIPP site, allowing the proposed . . . Well No. 93 would "waste" commercial deposits of potash as defined in . . . Section 70-2-3.

10

43. In addition, the proposed . . . Well No. 93 is at a location 660 feet from the North and East lines (Unit A) of Section 7, Township 23 South, Range 31 East, NMPM, which is less than one-half mile from Mosaic's [LMRs]. While the proposed location is on fee land, where [LMRs] are not designated, the location is still less than one-half mile from Mosaic's [LMRs] located on federal lands. Therefore, Order [No.] R-111-P prohibits approval of Bass'[s] APD.

44. Bass has alternative methods to develop the fee oil and gas minerals in the NE/4 NE/4, Section 7, Township 23 South, Range 31 East, NMPM. There are producing wells, . . . Well No. 14 and . . . Well No. 15, that have been directionally drilled and have bottomhole locations under Section 7, Township 23 South, Range 31 East, NMPM. Bass has not applied with the BLM to directionally drill a new well from . . . Well No. 14's well pad to a bottomhole location under the NE/4 NE/4, Section 7, Township 23 South, Range 31 East, NMPM[] and, therefore, has not shown that . . . Well No. 14 well pad is unavailable as a drilling location. Nor has Bass provided evidence that drilling a horizontal or directional well to a bottomhole location under the NE/4 NE/4, Section 7, Township 23 South, Range 31 East[,] NMPM is not technologically feasible.

45. Nor did Bass provide evidence showing that there are significant oil and gas resources in the shallower formations, which cannot be developed by horizontal or directional drilling, and would require a vertical well.

a. **Waste**

{31} At the hearing before the OCC, Mosaic presented an expert witness who testified that, according to his calculations, $11 million in potash would be wasted if Bass's proposed well was drilled. The expert explained that Mosaic's mines are regulated and subject to inspection by the MSHA. He testified further that Mosaic's mines do not contain methane gas in such quantities that would require compliance with more strenuous regulations that could prove to cost several hundred million dollars. Finally, he testified that having a well nearby mining operations increases the risk of methane gas in the mine, and there was "entirely too much risk involved" for Mosaic to mine too close to a deep well. Essentially, Mosaic's expert testified that the buffer zone was needed for safety of the mining operation, and Mosaic was unwilling to mine within one-half mile of a deep well. A review of the record reveals that Mosaic's calculations concerning waste were never challenged at the OCC hearing, and no contradictory evidence was introduced. Under cross-examination, Mosaic's expert was questioned about how he arrived at his monetary figures regarding waste of potash and about his expertise in drilling for oil or gas (of which he said he had none). However, Mosaic's expert was tendered as an expert mining engineer, and no

11

evidence was introduced which was contrary to OCC's conclusions regarding waste of potash. The evidence in the record is therefore sufficient to support a finding of waste of potash.

**b.     Commercial Potash Versus Measured Ore**

**{32}**     The district court, in determining that the OCC's order lacked substantial evidence, stated in its memorandum opinion that "[t]he [OCC] abdicated its duties by presuming that [Mosaic's] LMR designation and the BLM's measured ore label are equivalent to finding the existence of commercial potash that may reasonably be mined, and thereby left the record without substantial evidence in that regard." To the extent that Applicants and the Mills family rely on this argument, we are unpersuaded. We make several observations.

**{33}**     In his opening statement, counsel for Mosaic stated "I don't think there will be any dispute that all three of these surface locations are in commercial-grade potash." Bass's expert witness in petroleum land matters began his testimony by acknowledging that Section 7 is within measured potash ore and, likewise, Devon's expert in petroleum land matters began his testimony by stating that Section 24 was also within measured ore. Under cross-examination, Mosaic's expert explained that "measured ore" is the BLM's categorization for "[a]nything that's at or above four foot of 4-percent mining, 10-percent sylvite, or any combination, is included, and only when there's three or more [core hole samples] within a mile and a half of each other to make that ore zone a legitimate." Later, he testified specifically regarding percentages of sylvite and stated that he was able to determine actual numbers for the thickness of the ore in Section 7. Ultimately, the OCC's findings concluded that Bass's proposed well was located in measured ore, would prevent the mining of "0.66 million tons of 4½ percent ore," and would therefore waste "commercial deposits of potash as defined in . . . Section 70-2-3." Order No. R-12402-A(42). This was sufficient.

**{34}**     The OCC by statute is to be comprised of members that have expertise in "the regulation of petroleum production by virtue of education or training." Section 70-2-4; *see* NMSA 1978, § 70-2-5 (1987) (stating that a director is a "state petroleum engineer" who is "registered by the state board of registration for professional engineers and land surveyors as a petroleum engineer" or "by virtue of education and experience [has] expertise in the field of petroleum engineering"); *Santa Fe Exploration Co.*, 114 N.M. at 115, 835 P.2d at 831 ("Where a state agency possesses and exercises such knowledge and expertise, we defer to their judgment."). Here, the percentages and locations of the core hole samples were provided to the OCC, and expert testimony was given the provided dollar amounts of waste. An agency with expertise can determine whether percentages of ore, tonnage of waste, or a dollar amount of potash waste in a specifically defined area immediately surrounding a proposed well would rise to the level of commercial potash.

**{35}**     We also note that the OCC's orders conflate the terms "measured ore" and "commercial potash," and the term "measured ore" was used throughout the OCC hearing without objection. In both orders, the OCC noted that "Order [No.] R-111-P's effect is to

12

permit the drilling of oil and gas wells in lower grade marginal or uneconomic potash ore deposits in the potash area while preventing the waste of potash and more fully protecting the higher-grade ore deposits." Order No. R-12402-A(7); Order No. R-12403-A(7). In both orders, the OCC stated that the proposed drilling locations were "within an area designated as measured potash ore (the higher grade ore deposits) and contains LMRs [Mosaic] has designated pursuant to Order [No.] R-111-P." Order No. R-12402-A(8); Order No. R-12403-A(8). To the extent that Applicants rely on the district court's argument that the record is without substantial evidence that commercial potash is equivalent to measured ore, we remain unconvinced. Applicants have not demonstrated how measured ore is not analogous to commercial potash. Without more, we cannot say that the OCC was incorrect in interpreting its specialized nomenclature and in concluding that the information provided was sufficient for a showing of waste of commercial potash. "By definition, the inquiry is whether, on the record, the administrative body could reasonably make the findings. Moreover, in considering these issues, we will give special weight and credence to the experience, technical competence[,] and specialized knowledge of the Commission." *Grace v. Oil Conservation Comm'n of N.M.*, 87 N.M. 205, 208, 531 P.2d 939, 942 (1975) (citation omitted). We therefore decline to engage in a semantic debate without a clear showing of the necessity to do so.

**{36}** We additionally note that it was Applicants that had the burden at the OCC hearing. The district court incorrectly determined that, as a matter of law, the burden should have been placed on Mosaic. As discussed above, an APD within a designated LMR or buffer zone means that the burden is on the applicant to demonstrate that commercial potash will not be wasted by the development of oil or gas resources. It is the applicant that must demonstrate the area in question is not within commercial potash, or the drilling will not unduly waste commercial potash. *See* § 70-2-3(F); § 70-2-12(B)(17); Order No. R-111-P(20).

### c.    Alternative Methods

**{37}** Applicants argue that the OCC's determination that alternative methods existed for Applicants to produce the oil and gas reserves under their leases was not supported by substantial evidence. They allege that the engineers who testified at the OCC hearing stated that the kind of "directional or horizontal well bores" required would be "uneconomic and physically impossible" and, therefore, the record lacks substantial evidence in light of the findings. We do not agree.

**{38}** At the hearing, Bass's expert testified that "[a] horizontal well goes vertically straight down from the surface location to the target zone, and then it turns approximately [ninety] degrees and drills through the productive formation. A directional well goes from the surface in an 'S' curve or some other angle to a target . . . location." Bass's expert testified further that Bass wanted to drill a vertical well from the proposed location to test the shallower formations, such as "the Delaware formation," as well as the ultimate bottom-hole objective, "the Morrow formation." There was no testimony that a directional well to the

13

Morrow formation would be uneconomic. Bass's expert testified there are two other wells in Section 7 and assumed the reason both of them were directional wells was so they would avoid potash. When he was asked specifically if a directional well could be drilled to the Morrow formation underlying the Mills' property from one of the other already existing drill locations in Section 7, he stated that he did not know. However, he did acknowledge that the only two other wells in Section 7 were directional, were "pretty long," and reached the Morrow formation. He further agreed that he had "never said that a directional well to the deeper gas zones is impractical if the distance is reasonable." However, he did state that "a directional well cannot exploit the shallower zones under [the Mills' forty]-acre tract." Conversely, Bass presented testimony from William Dannels, a drilling engineer, who stated that, although it would be expensive, the Delaware formation could be reached directionally or horizontally from one of the existing well locations in Section 7, and there were other oil and gas operators that were doing that type of drilling.

{39}    Mosaic's expert testified that Mosaic would not object to a directional or horizontal well from one of the existing well pads in Section 7 that accessed whatever potential resources were under the Mills' property. We therefore conclude that because there was evidence it was possible to drill by another method, and there was evidence it had been done in other instances, it was reasonable for the OCC to infer in the absence of evidence to the contrary that "Bass [had] alternative methods to develop the fee oil and gas minerals in [the forty-acre tract]." Order No. R-12402-A(44).

{40}    The OCC correctly concluded there was no testimony regarding the probability of the productivity of the shallower formations under the Mills' property. Order No. R-12402-A(45). Likewise, Bass presented no evidence regarding the amount of oil expected to be recovered, or specific testimony on the increase of cost that would be required in order to access the expected amount of oil directionally or horizontally. Without such evidence, Bass provided the OCC with no information on the feasibility of the alternatives. In light of the record and within the context of the standard of review detailed above, we conclude that the decision of the OCC was supported by substantial evidence.

## 2.    The Case for Devon

{41}    In Order No. 12403-A, the OCC made the following relevant findings:

> 42.    Within one-half mile of the location of the proposed location of . . . Well No. 7-A, the 10th potash ore zone at just under five foot of height contains 11 percent sylvite.

> 43.    Mosaic's witness testified that allowing the proposed . . . Wells No. 7-A and No. 6 would waste $56 million in potash. Mosaic based its waste calculation on the assumption that the location of the proposed . . . Well No. 7-A would subsume the location of the proposed . . . Well No. 6.

14

44.    Twenty-three million dollars of the potash wasted would be on leases that Mosaic currently holds.

45.    Given that the proposed . . . Wells No. 6 and No. 7-A are located in measured potash ore and would prevent the mining of $56 million worth of commercial potash, . . . Wells No. 6 and No. 7-A would "waste" commercial deposits of potash as defined in . . . Section 70-2-3.

46.    In addition, the proposed . . . Well No. 6 is at a location 1980 feet from the North line and 660 feet from the West line (Unit E) of Section 24, Township 22 South, Range 30 East, NMPM, and the proposed . . . Well No. 7-A is at a location 1460 feet from the North line and 1150 feet from the West line (Unit E) of Section 24, Township 22 South, Range 30 East, NMPM. Both locations are less than one-half mile from Mosaic's LMRs. While the proposed locations are on fee land, where LMRs are not designated, the location is still within one-half mile of Mosaic's LMRs located on federal lands. Therefore, Order [No.] R-111-P prohibits approval of Devon's APDs.

47.    Devon has alternative methods to develop the fee oil and gas minerals in the SW/4 NW/4, Section 24, Township 22 South, Range 30 East, NMPM[,] including unitization and directional or horizontal drilling. There are four producing wells that have been horizontally drilled from the "drilling island" and have bottomhole locations under Section 24, Township 22 South, Range 30 East, NMPM, so drilling such wells is technologically feasible. Devon could have drilled . . . Well No. 10 to access the minerals under the SW/4 NW/4, Section 24, Township 22 South, Range 30 East, NMPM, but chose not to.

### a.    Waste

**{42}**    At the OCC hearing, Mosaic's expert testified the proposed Devon Well No. 7-A would condemn a half-mile radius of potash around the well, which would be needed for a safety buffer. The condemned potash was calculated to have at least 11% sylvite and a value of $56 million. Additionally, the expert calculated that, for the land Mosaic had a lease on, the dollar amount was $23 million. Again, this evidence was uncontroverted.

### b.    Alternative Methods

**{43}**    Devon's expert in petroleum land matters, Kenneth Gray, testified there was a BLM-recognized drilling island along the eastern boundary of Section 24 where the Smiths' forty-acre tract is located, and Devon had drilled several horizontal wells across Section 24 from

15

that drilling island, one of which was nearly a mile long. When asked by Mosaic's counsel if it was possible to drill a horizontal well from the eastern boundary of Section 24 to the intended bottom-hole location under the Smiths' forty-acre tract, Devon's expert responded: "Absolutely we can." He also confirmed the proposed bottom-hole location for the deeper well could be accessed by a directional well from the drilling island. Devon's expert in drilling engineering testified Devon had drilled horizontally from the drilling island into Section 24 on four other occasions, and they were "[a]nywhere from three-quarters of a mile to a mile offset." Additionally, Devon's drilling engineer testified that the reason that a horizontal well could not be economically drilled to the Smiths' forty-acre tract from the drilling island was that Devon had chosen to drill another well, Well No. 10, from the drilling island that stopped short of the Smiths' property and now precluded Devon from economically reaching the targeted bottom-hole location. The record shows this well was drilled in either December 2005, or January 2006, which would mean it was drilled after the OCD's approval of Devon's APDs and after Mosaic's application for a de novo hearing to OCC, five to six months before the actual OCC hearing where it would be determined whether Devon would be allowed to drill the wells in question. As Devon's engineer explained, Well No. 10 could not be economically extended into the Smiths' forty-acre tract because the bore hole that was drilled was too narrow, and Devon could not economically drill another horizontal well that would penetrate the Smiths' forty-acre tract because the reserves under the Smiths' property alone would not be sufficient to justify drilling another horizontal well across sections that were already being produced by Well No. 10.

**{44}** This testimony indicates that any economic barriers that existed were created by Devon, who chose to drill a well, that could potentially, and ultimately did, stymie resource retrieval under the subject tract. The OCC was not incorrect in concluding that Devon had alternative ways of reaching the resources and still could reach the resources if it so chose. Whether those methods were economical were not specifically addressed. No figures were provided by Devon regarding costs of vertical as opposed to directional or horizontal drilling, and no estimates were provided to the OCC regarding amounts of expected oil or gas reserves. In the case for the proposed Devon wells, we conclude the decision of the OCC was supported by substantial evidence.

## C. Arbitrary and Capricious

**{45}** A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis when viewed in light of the whole record. *Snyder Ranches, Inc.*, 110 N.M. at 639, 798 P.2d at 589. An arbitrary and capricious action by an administrative agency "is the result of an unconsidered, wilful[,] and irrational choice of conduct and not the result of the winnowing and sifting process." *Santa Fe Exploration Co.*, 114 N.M. at 115, 835 P.2d at 831 (internal quotation marks and citation omitted). An action will be considered arbitrary if there is no rational connection between the facts found and choices made, or necessary aspects of consideration or relevant factors are omitted. *N.M. Mining Ass'n*, 2007-NMCA-010, ¶ 22. "Where there is room for two opinions, the action is not arbitrary or capricious if exercised honestly and upon due consideration, even though

another conclusion might have been reached." *Snyder Ranches, Inc.*, 110 N.M. at 639, 798 P.2d at 589 (internal quotation marks and citation omitted).

**{46}** Applicants contend that the OCC's orders do not reflect a balancing of the interest of potash operators and the interests of oil and gas operators. We disagree. At the OCC hearing, Mosaic elicited testimony from representatives of both Applicants that tended to show that alternative means existed for access to the oil and gas reserves. Mosaic presented unrefuted testimony regarding waste of potash and the logic or rationale behind the buffer-zone concept. Additionally, Mosaic provided the OCC with specifics regarding the amount of waste and the potential costs if methane were to permeate into Mosaic's mines. Both of the OCC's orders reflect that these matters were taken into consideration. *See* Order No. R-12402-A(4), (6), (7), (9), (10), (12), (13), (23)-(25), (40)-(45) (defining the potash area and LMR, interpreting the effect of Order No. R-111-P, noting the inherent difficulties in attempting to develop both potash and oil and/or gas, and acknowledging potash would be wasted if the APD were approved, and that Bass had alternative methods to access the resources); Order No. R-12403-A(4), (6), (7), (9), (10), (12), (13), (21)-(23), (36), (37), (39), (42)-(47) (same for Devon).

**{47}** Next, we observe that in Order No. R-12402-A(43), the OCC noted that "[i]n addition . . . Well No. 93 . . . is less than one-half mile from Mosaic's [LMR and, t]herefore, Order [No.] R-111-P prohibits approval of Bass'[s] APD." To the extent that the Mills family and Applicants argue that this demonstrates the OCC's misunderstanding or the arbitrary or capricious application of their own rules and regulations, we remain unconvinced. Mosaic correctly notes the OCC listed numerous reasons for denying Well No. 93. The OCC stated that "in addition" to the reasons already enumerated, the proposed Well No. 93 was within the buffer zone of Mosaic's LMR, and "Order [No.] R-111-P prohibits approval." Order No. R-12402-A(43). As we have already analyzed, this is essentially the correct interpretation. Although there is no discussion in Paragraph 43, regarding Applicants qualifying for an exception to OCC's rules and regulations, from the context of the order, it is clear that Applicants failed to carry their burden of showing a valid reason for an exception, and that the OCC considered whether an exception would apply.

**{48}** Finally, Applicants cite to *Fasken v. Oil Conservation Commission*, 87 N.M. 292, 532 P.2d 588 (1975) for the proposition that agency orders that do not contain findings of ultimate facts, which are material to the issues and have support in the record, require reversal. Applicants argue that the orders lack findings on the OCC's statutory duty to prevent waste of oil and gas and to protect correlative rights of the owners of resources and, therefore, reversal of the orders are required. In *Fasken*, our Supreme Court noted that findings must be sufficient to disclose the reasoning of an agency in reaching its ultimate findings and, while elaborate findings were not required, findings should be "sufficiently extensive" to demonstrate the basis of the order. *Id.* at 294, 532 P.2d at 590 (internal quotation marks and citation omitted). The Supreme Court stated further that they did not have "the vaguest notion of how the [OCC] reasoned its way to its ultimate findings." *Id.*

17

That is not the case here. The OCC's orders in the context of the evidence presented, and the statutory mandates and rules implemented by the OCC, clearly demonstrate a rational connection between the facts found and choices made. We cannot say that the OCC failed to engage in reasoned decision-making. Thus, we conclude that the OCC's action was not arbitrary or capricious.

## D.    Due Process

{49}    Applicants allege that the OCC's interpretation of R-111-P violates the due process rights of owners of oil and gas interests in the potash area. In its reply brief, Mosaic initially counters this issue was not raised below at the OCC hearing, was not addressed by the district court, and cannot now be addressed on appeal. This conclusion is not accurate as a matter of law. A similar issue was discussed by this Court in *Maso v. New Mexico Taxation & Revenue Department*, 2004-NMCA-025, 135 N.M. 152, 85 P.3d 276. In that case, we determined that, in administrative appeals, "the district court can simultaneously exercise its appellate and original jurisdiction." *Id.* ¶ 17. The Motor Vehicle Division lacked the statutory authority to consider a due process argument and, therefore, the district court lacked the appellate jurisdiction to review the constitutional question. *Id.* ¶ 13. We concluded, however, that the district court could hear the matter in its original jurisdiction, and a district court should consider each claim in such a situation with proper reference to the appropriate standard of review. *Id.* ¶¶ 14, 16. When constitutional claims are beyond the scope of an agency's subject matter jurisdiction and are subsequently raised for the first time on appeal to the district court, the authority exists for the issue to be considered in the first instance. *See id.* ¶¶ 14, 17. In this case, the district court concluded that the OCC's orders were lacking in substantial evidence, were not in accordance with the law, and were arbitrary and capricious and, therefore, the orders were void as a matter of law. The district court concluded that because the orders were void, it was unnecessary to address Applicants' due process claims. Upon review, we will not defer to the district court's conclusions of law. *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806 (filed 2002). "[W]hether . . . due process rights were violated presents a question of law that we review de novo." *Maso*, 2004-NMCA-025, ¶ 18.

{50}    Applicants aver that under the OCC's interpretation of R-111-P, the OCC "must categorically deny" an APD if the proposed location is within an LMR or a  buffer zone. The LMR designation then prevents owners of oil or gas interests from developing their property rights, and there is no opportunity for them to participate in the SLO or BLM proceedings, or to review or challenge the data that is presented. Accordingly, they argue their due process rights were violated.

{51}    "In administrative proceedings[,] due process is flexible in nature and may adhere to such requisite procedural protections as the particular situation demands." *State ex rel. Battershell v. City of Albuquerque*, 108 N.M. 658, 662, 777 P.2d 386, 390 (Ct. App. 1989); *see Mills v. N.M. State Bd. of Psychologist Exam'rs*, 1997-NMSC-028, ¶ 19, 123 N.M. 421, 941 P.2d 502 ("Procedural due process requirements are not static, and the extent of the

hearing required is determined on a case by case basis."). We determine what process is due in administrative proceedings from a balancing of

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional procedural safeguards; and (3) the [g]overnment's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 321 (1976) (internal quotation marks and citation omitted). "In balancing these factors, we consider the proceedings as a whole." *In re Comm'n Investigation Into 1997 Earnings of U S West Commc'ns, Inc.*, 1999-NMSC-016, ¶ 26, 127 N.M. 254, 980 P.2d 37 (internal quotation marks and citation omitted).

**{52}** We initially note that Applicants' first premise is not entirely accurate. Although Order No. R-111-P(20) does state that "in the interest of preventing waste of potash [the OCC] should deny any application to drill in commercial potash areas," it also provides that an applicant may make a demonstration that commercial potash will not be wasted unduly as a result of the drilling of the well. As we have already analyzed, Order No. R-111-P(G)(3) does not require categorical denial of an APD simply because a proposed drilling location is within an LMR or buffer zone. Instead, an applicant wishing to drill within an LMR or buffer zone merely has the burden of showing that no commercial potash will be wasted unduly, which is a burden that an applicant would carry anyway according to the statute.

**{53}** As we noted earlier in this Opinion, the OCC has recognized that an applicant must be given the opportunity to review the geologic basis for an LMR designation when that designation may prevent access to oil or gas resources. Order Nos. R-9650-A and R-9651-A(7). Likewise, even though the designation may be upheld, an applicant still may obtain an exception by showing that a proposed well would not unduly waste potash. Order Nos. R-9650-B and R-9651-B. In the immediate case, Applicants were given the opportunity to either challenge Mosaic's LMR, or to demonstrate that their proposed wells would not unduly waste potash or "interfere unduly with the orderly commercial development of the potash deposits." Section 70-2-12(B)(17). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Albuquerque Commons P'ship v. City Council of Albuquerque*, 2009-NMCA-065, ¶ 29, 146 N.M. 568, 212 P.3d 1122 (internal quotation marks and citation omitted), *cert. granted*, 2009-NMCERT-007, 147 N.M. 363, 223 P.3d 360; *N.M. Indus. Energy Consumers v. N.M. Pub. Serv. Comm'n*, 104 N.M. 565, 568, 725 P.2d 244, 247 (1986) ("[D]ue process is a flexible concept whose essence is the right to be heard at a meaningful time and in a meaningful manner.").

**{54}** Applicants do not argue that (1) Mosaic withheld geologic information before the OCC hearing; (2) they were not afforded the opportunity to capitalize on the subpoena

powers of the OCC before hearing; or (3) they had no method of obtaining the data used by Mosaic in obtaining the LMRs, or in demonstrating the amounts of potentially wasted potash before the hearing. In fact, the record contains subpoenas from Bass prior to the hearing, requesting maps of potash enclaves and core hole data and economic evaluations from potash deposits surrounding the proposed well site. At the hearing, Applicants did not challenge (1) the LMR designation, (2) Mosaic's assertions about the quality or amount of potash in the proposed area, (3) whether the wells posed a potential threat to the safety of miners and the mining industry, and (4) nor did they assert that the amount of potential waste of potash would not be unjustifiable under the circumstances, or that the proposed wells would not excessively interfere with the production of commercial potash. Applicants merely argued that the Mills family and the Smith family had given them consent to drill and, therefore, they were entitled to do so.

**{55}** Upon consideration of the hearing as a whole, we conclude that Applicants were given the opportunity to challenge the LMR determinations or, alternatively, to demonstrate that their wells would not unduly waste potash. As discussed above, Applicants chose not to challenge the geologic data and did not argue the proposed wells could be operated in harmony with Mosaic's interests. Consequently, we reject the contention that Applicants' due process rights were violated.

### III. CONCLUSION

**{56}** For the reasons stated above, we reverse the district court and remand with instructions to affirm the original orders of the OCC in Order No. R-12402-A (Case No. 13367) and Order No. R-12403-A (Case Nos. 13368 and 13372).

**{57}** **IT IS SO ORDERED.**

 

 

_____

**ROBERT E. ROBLES, Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**CELIA FOY CASTILLO, Judge**

**Topic Index for _Bass Enters. Prod. Co. v. Mosaic Potash Carlsbad Inc._, Docket Nos. 28,746/28,747**

**AL**                         **ADMINISTRATIVE LAW AND PROCEDURE**
AL-AL                Administrative Law, General

| | |
|---|---|
| AL-AC | Arbitrary and Capricious Actions |
| AL-DU | Due Process |
| AL-JR | Judicial Review |
| AL-LI | Legislative Intent |
| AL-SC | Scope of Review |
| AL-SR | Standard of Review |
| AL-SE | Sufficiency of Evidence |
| | |
| **JD** | **JURISDICTION** |
| JD-SM | Subject Matter |
| | |
| **NR** | **NATURAL RESOURCES** |
| NR-MM | Mines and Minerals |
| NR-OG | Oil and Gas |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |