This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-37449**

**JALAPENO CORPORATION,**

      Appellant,

v.

**NEW MEXICO OIL CONSERVATION COMMISSION,**

      Appellee,

and

**MARATHON OIL PERMIAN LLC and NEW MEXICO OIL & GAS ASSOCIATION,**

      Intervenors-Appellees,

**IN THE MATTER OF THE APPLICATION OF THE NEW MEXICO OIL CONSERVATION DIVISION TO AMEND RULES OF THE COMMISSION CONCERNING THE DRILLING, SPACING, AND OPERATION OF HORIZONTAL WELLS AND RELATED MATTERS BY AMENDING VARIOUS SECTIONS OF RULES 19.15.4, 19.15.14, 19.15.15, 19.15.16 NMAC STATEWIDE.**

**APPEAL FROM NEW MEXICO OIL CONSERVATION COMMISSION**
**Heather Riley, Chair**

Gallegos Law Firm, P.C.
J.E. Gallegos
Michael J. Condon
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
William R. Brancard, Special Assistant Attorney General
Santa Fe, NM

for Appellee

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Jennifer L. Bradfute
Deana M. Bennett
Albuquerque, NM

for Intervenor Marathon Oil Permian LLC

Holland & Hart LLP
Michael H. Feldewert
Julia Broggi
Santa Fe, NM

for Intervenor New Mexico Oil and Gas Association

**MEMORANDUM OPINION**

**VARGAS, Judge.**

**{1}**     In 2018, the New Mexico Oil Conservation Division (the Division) sought to "comprehensively revise the rules governing horizontal wells" under the Oil and Gas Act (the Act), NMSA 1978, §§ 70-2-1 to -39 (1935, as amended through 2019). Horizontal wells are well bores "with one or more laterals that extend a minimum of 100 feet laterally in the target zone." 19.15.16.7(G) NMAC;[1] *see also* 19.15.16.7(K) NMAC (defining "lateral" as "the portion of a directional or horizontal well past the point where the well bore has been intentionally deviated from the vertical"). As part of the revision, the New Mexico Oil Conservation Commission (the Commission) adopted, in relevant part, a 2018 version of 19.15.15 and 19.15.16 NMAC (the 2018 Rules).[2]

**{2}**     Petitioner Jalapeno Corporation (Jalapeno) appeals the Commission's adoption of the 2018 Rules governing the drilling of horizontal wells pursuant to Section 70-2-12.2(C) ("Any party of record to the proceeding before the [C]omission . . . may appeal to the [C]ourt of [A]ppeals[.]"). Jalapeno contends that the 2018 Rules establishing

---

[1]To reflect the new distinction between horizontal and directional wells, the Commission amended the definition of a horizontal well. *See* 19.15.16.7(E) NMAC (2/15/2012) (defining "horizontal well as "a directional well bore with one or more laterals that extend a minimum of 100 feet horizontally in the target zone").

[2]The Commission subsequently adopted amendments correcting cross-reference errors in 19.15.16.15(B)(8), (E)(2)(b) NMAC. These amendments are not the subject of the present appeal.

guidelines for well spacing, infill horizontal wells, and transitional provisions are arbitrary and capricious and contrary to law. Finding no error on the part of the Commission, we affirm.

**DISCUSSION**

**I.      Standard of Review**

**{3}**      On appeal, we may set aside a rule adopted under the Act only if we conclude the rule is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 70-2-12.2(C). The burden is on the party challenging the rule to make this showing. *See N.M. Mining Ass'n v. Water Quality Control Comm'n*, 2007-NMCA-084, ¶ 19, 142 N.M. 200, 164 P.3d 81 ("A party challenging a rule adopted by an administrative agency has the burden of establishing the invalidity of the rule." (internal quotation marks and citation omitted)). In this case, Jalapeno limits its arguments to whether the 2018 Rules are arbitrary and capricious or not in accordance with law.

**{4}**      We will set aside a rule on grounds that it is "arbitrary and capricious if it is unreasonable or without a rational basis when viewed in light of the whole record." *Bass Enters. Prod. Co. v. Mosaic Potash Carlsbad Inc.*, 2010-NMCA-065, ¶ 45, 148 N.M. 516, 238 P.3d 885. "An action will be considered arbitrary if there is no rational connection between the facts found and choices made, or necessary aspects of consideration or relevant factors are omitted." *Id.* "The party challenging a rule adopted by an administrative agency carries the burden of showing that the rule is arbitrary or capricious by demonstrating that the rule's requirements are not reasonably related to the legislative purpose." *Earthworks' Oil & Gas Accountability Project v. N.M. Oil Conservation Comm'n*, 2016-NMCA-055, ¶ 11, 374 P.3d 710 (alteration, internal quotation marks, and citation omitted).

**{5}**      We will set aside a rule on the ground that it is not in accordance with law "if the agency unreasonably or unlawfully misinterprets or misapplies the law." *Bass Enters. Prod. Co.*, 2010-NMCA-065, ¶ 11 (internal quotation marks and citation omitted). Although "[w]e are not bound by an agency's interpretation of a statute, since it is a matter of law that is reviewed de novo[,]" we give an agency's interpretation of a statute governing the agency "some deference." *Id.* (internal quotation marks and citation omitted). "Rules, regulations, and standards that have been enacted by an agency are presumptively valid and will be upheld if reasonably consistent with the authorizing statutes." *Id.* (internal quotation marks and citation omitted).

**II.      Well Spacing**

**{6}**      Jalapeno first challenges the 2018 Rules concerning well spacing, arguing that the Commission's failure to specify acreage requirements for horizontal spacing units (1) contravenes its purported legal duty to establish spacing units based on the area

that can be efficiently and economically drained by one well, and (2) abdicates to operators its statutory obligation to fix well spacing.[3]

**{7}** Pursuant to the Act, the Legislature provided the Commission with the power and duty to prevent waste and protect correlative rights in the production or handling of crude petroleum oil or natural gas. *See* § 70-2-3 (defining "waste"); § 70-2-33(H) (defining "correlative rights"); § 70-2-2 (prohibiting waste in the production or handling of crude petroleum oil or natural gas); § 70-2-11(A) (providing the Division with the power and duty to prevent waste and protect correlative rights); § 70-2-11(B) (explaining that the Commission has "concurrent jurisdiction and authority with the [D]ivision to the extent necessary for the [C]ommission to perform its duties as required by law"). To carry out its duties, the Legislature "empowered [the Commission] to make and enforce rules, regulations and orders, and to do whatever may be reasonably necessary to carry out the purpose of [the Act], whether or not indicated or specified in any section [of the Act]." Section 70-2-11(A). In addition to this broad grant of authority, the Legislature specifically authorized the Commission to make rules and regulations "to fix the spacing of wells[.]" Section 70-2-12(B)(10).

## A.    The 2018 Rules Concerning Well Spacing

**{8}** Prior to 2018, the rules promulgated by the Commission provided that unless otherwise provided by the Commission, oil and gas wells are to be located on spacing units that comply with specific acreage requirements established by the rules. *See* 19.15.15.9(A) NMAC (providing that an oil well "be located on a spacing unit consisting of approximately forty contiguous surface acres"); 19.15.15.10 NMAC (providing county-specific acreage requirements for gas well spacing units). A "spacing unit" is "the area allocated to a well under a well spacing order or rule." 19.15.2.7(S)(9) NMAC. In 2018, the Commission's newly promulgated rule provided that "[e]ach horizontal well shall be dedicated to a standard horizontal spacing unit or an approved non-standard horizontal spacing unit, except for infill horizontal wells and multi-lateral horizontal wells[.]" 19.15.16.15(A)(2) NMAC; *see also* 19.15.16.15(B)(1), (3) NMAC (stating that standard horizontal spacing units are in lieu of the oil and gas spacing units described in 19.15.15.9 and 19.15.15.10 NMAC). The Commission defined the criteria for a standard *horizontal* spacing unit for a horizontal oil well as follows:

> (a) The horizontal spacing unit shall comprise one or more contiguous tracts that the horizontal oil well's completed interval penetrates, each of which consists of a governmental quarter-quarter section or equivalent.

---

3Jalapeno also argues the 2018 Rules concerning well spacing constitute a due process violation. To the extent this argument falls outside the scope of its challenge to the transitional provisions—which we address further below—it was raised for the first time in Jalapeno's reply brief, and we decline to address it. *See Guest v. Berardinelli*, 2008-NMCA-144, ¶ 36, 145 N.M. 186, 195 P.3d 353 ("[W]e do not consider arguments raised in a reply brief for the first time."); *see also* Rule 12-318(C) NMRA (providing that the reply brief "shall reply only to arguments or authorities presented in the answer brief").

(b) In addition to tracts the horizontal oil well penetrates, the operator may include quarter-quarter sections or equivalent tracts in the standard horizontal spacing unit that are located within 330 feet of the proposed horizontal oil well's completed interval (measured along a line perpendicular to the proposed completed interval or its tangent).

(c) If, however, the perimeter of the area that includes all the tracts that the horizontal oil well penetrates encloses an area that is substantially rectangular, then the operator may not bring in additional tracts that would results in a non-rectangular horizontal spacing unit.

(d) The horizontal spacing unit shall contain at least the minimum acreage required by existing or subsequently adopted special pool orders for a spacing unit in any pool where all or part of the horizontal oil well's completed interval is located.

19.15.16.15(B)(1) NMAC.[4]

**{9}** Horizontal gas wells are subject to criteria similar to those required for horizontal oil wells:

(a) The horizontal spacing unit shall comprise one or more contiguous tracts that the horizontal gas well's completed interval penetrates, each of which consists of a governmental quarter section or equivalent.

(b) In addition to tracts the well penetrates, the operator may include quarter sections or equivalent tracts in the standard horizontal spacing unit that are located within 330 feet of the proposed horizontal gas well's completed interval (measured along a line perpendicular to the proposed completed interval or its tangent).

(c) If, however, the perimeter of the area that includes all the tracts that the horizontal gas well penetrates encloses an area that is substantially rectangular, then the operator may not bring in additional tracts that would result in a non-rectangular horizontal spacing unit.

(d) The horizontal spacing unit shall contain at least the minimum acreage required by 19.15.15.10 NMAC or by existing or subsequently adopted special pool orders for a spacing unit in any pool where all or part of the horizontal gas well's completed interval is located.

19.15.16.15(B)(3) NMAC.

---

[4]The Commission defines "completed interval" as "that portion of a well bore or lateral that is: (1) cased, cemented and perforated; (2) an open hole; or (3) isolated by a packer or other non-permeable means and open to the formation." 19.15.16.7(B) NMAC.

**{10}**　　Horizontal spacing units that do not meet the foregoing criteria are considered non-standard horizontal spacing units and must be approved by the Division after notice and an opportunity for hearing. 19.15.16.15(A)(3) NMAC; *see* 19.15.16.15(B)(5) NMAC (providing the process for approving non-standard horizontal spacing units).

**B.　　Jalapeno's Challenges to the 2018 Rules Concerning Well Spacing**

**{11}**　　Jalapeno argues the Commission is required to establish acreage requirements when fixing the spacing of wells. Initially, we note that Jalapeno fails to explain why the provisions of the rules establishing horizontal spacing units for oil and gas wells in quarter-quarter sections and quarter sections, respectively, are insufficient to satisfy the acreage requirements it claims are mandated by the statute. *See* 19.15.16.15(B)(1)(a), (b), (3)(a) NMAC; *Quarter section*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/quarter%20section (last visited Sept. 17, 2020) (defining a "quarter section" as "a tract of land that is half a mile square and contains 160 acres in the U.S. government system of land surveying"). Instead, noting generally the Commission's duties to prevent waste and protect correlative rights, Jalapeno contends that the 2018 Rules disregard the "essential standard" for that duty set forth in Section 70-2-17(B), which provides, "The [D]ivision may establish a *proration unit* for each pool, such being the area that can be efficiently and economically drained and developed by one well[.]" (Emphasis added); *see also* 19.15.2.7(P)(17) NMAC (defining a "proration unit" as "the area in a pool that can be effectively and efficiently drained by one well as determined by the [D]ivision or [C]ommission as well as the area assigned to an individual well for the purposes of allocating allowable production pursuant to a prorationing order for the pool" (citation omitted)). Jalapeno's reliance on Section 70-2-17(B) is misplaced, as that provision of the statute discusses the standard for "proration" units rather than "spacing" units, and our Supreme Court has established a clear distinction between the two. *See Rutter & Wilbanks Corp. v. Oil Conservation Comm'n* (*Rutter*), 1975-NMSC-006, ¶ 6, 87 N.M. 286, 532 P.2d 582 (recognizing that the use of the phrase "spacing or proration unit" in the prior compilation of Section 70-2-17 "indicat[es] that the terms are not synonymous and impl[ies] that a spacing unit may be created independently of a proration unit"); 19.15.2.7(S)(9) NMAC (providing that under Section 70-2-12(B)(10)'s authorization to "fix the spacing of wells," "the [C]ommission may fix spacing units without first creating proration units").

**{12}**　　Jalapeno argues any distinction drawn in *Rutter* between spacing and proration units is undermined because our Supreme Court in *Rutter* affirmed the commission's orders creating spacing units, based on the commission's findings that the section at issue could be "effectively and efficiently" drained by the existing wells. *See Rutter*, 1975-NMSC-006, ¶¶ 17, 24. Contrary to Jalapeno's characterization, however, our Supreme Court did not rely on these findings. Following its clarification that the commission's orders creating two non-standard *proration* units were intended to create two non-standard *spacing* units, our Supreme Court affirmed the commission on grounds that (1) the commission made sufficient findings as to the prevention of waste and the protection of correlative rights, and (2) the orders were supported by substantial evidence. *Id.* ¶¶ 5, 16, 18, 26. During this discussion, our Supreme Court cited the

commission's findings and the evidence indicating that existing wells could effectively and efficiently drain the section. *Id.* ¶¶ 17, 23-24. To the extent Jalapeno argues our Supreme Court's discussion of the findings and the evidence amounts to an adoption of the standard for proration units for spacing units, *Rutter* provides no basis for such a conclusion. *See Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22 ("The general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)). For this reason, the Section 70-2-17(B) standard applies only to proration units and not to spacing units. Because Jalapeno has not demonstrated that the Commission is required to provide acreage requirements in its rules governing *spacing* units, we cannot conclude that the newly promulgated rules related to well spacing are not in accordance with law or that they are arbitrary and capricious on these grounds.

**{13}** Jalapeno also argues the 2018 Rules effectively abdicate to operators the Commission's responsibility of fixing the spacing of wells. We first note that 19.15.16.15(B) NMAC delineates clear criteria that a standard horizontal spacing unit must satisfy: the minimum number and size of the tracts that must be included in the spacing unit; the maximum radius within which an operator may include certain subdivisions of sections; the form of the spacing unit; and the minimum size of the spacing unit if subject to a special pool order. The Commission found, to maximize recovery and minimize waste, the spacing regulations for horizontal wells should allow "the drilling to follow geological stress patterns" which extend across relatively long distances, permitting those stress pattern to determine the required acreage, subject to the formula set forth in the rule. Jalapeno does not challenge the Commission's findings. We conclude that Jalapeno has not demonstrated that the 2018 Rules misinterpret or misapply the law or that they are not reasonably related to the Commission's duty to prevent waste and protect correlative rights. *See N.M. Mining Ass'n*, 2007-NMCA-084, ¶ 19 (explaining that the burden is on the party challenging the rule to establish its invalidity).

### III.    Infill Horizontal Wells

**{14}** Jalapeno next challenges several of the 2018 Rules bearing upon infill horizontal wells. Following our discussion of the background of the relevant statutes and rules, we examine Jalapeno's arguments in more detail.

### A.    Background

**{15}** The Legislature authorized the compulsory pooling of separately owned lands or interests embraced within a spacing unit:

> Where . . . such owner or owners have not agreed to pool their interests, and where one such separate owner, or owners, who has the right to drill has drilled or proposes to drill a well on said unit to a common source of supply, the [D]ivision, to avoid the drilling of unnecessary wells or to

protect correlative rights, or to prevent waste, shall pool all or any part of such lands or interests or both in the spacing . . . unit as a unit.

Section 70-2-17(C). The Legislature further required that all orders effecting such pooling provide for the payment of costs and expenses by pooling owners and allowed for the assessment of a risk charge to non-consenting owners, not to exceed two hundred percent, in favor of the parties advancing the costs of development:

> Such pooling order of the Division shall make definite provision as to any owner, or owners, who elects not to pay his proportionate share in advance for the prorata reimbursement solely out of production to the parties advancing the costs of the development and operation, which shall be limited to the actual expenditures required for such purpose not in excess of what are reasonable, but which shall include a reasonable charge for supervision and may include a charge for the risk involved in the drilling of such well, which charge for risk shall not exceed two hundred percent of the non-consenting working interest owner's or owners' prorata share of the cost of drilling and completing the well.

*Id.*

**{16}** To effectuate this statutory provision for risk charges, the Commission promulgated a rule in 2008 that permits compulsory pooling orders to provide for the recovery of risk charges "associated with the drilling, completion or working over and re-completion of each unit well for which the order provides." 19.15.13.8(A) NMAC. The Commission set the risk charge at two hundred percent of well costs, the maximum allowed by statute, "[u]nless otherwise ordered" and established a procedure allowing owners to seek a lower risk charge. *See id.* (providing the two hundred percent risk charge); § 70-2-17(C) (providing that "the charge for risk shall not exceed two hundred percent"); 19.15.13.8(D) NMAC (placing the burden on the person seeking a different risk charge "to prove the justification for the risk charge sought by relevant geologic or technical evidence"). A compulsory pooling order may not be entered without notice to all affected land owners and a hearing. Section 70-2-17(C).

**{17}** Under the prior rules, which remain applicable to vertical and directional wells, an operator or owner of a pooled working interest may propose drilling of an "infill well" after completion of the initial well, if authorized by rule or an applicable pool order. 19.15.13.9 NMAC; *see* 19.15.13.7(A) NMAC (defining "infill well" as "a well in a compulsory pooled . . . spacing unit to be completed in a pool in which an existing well drilled pursuant to the compulsory pooling order has been completed and not plugged and abandoned"). Following notice by an operator of a proposal for an infill well, a pooled working interest owner may elect to participate in the proposed infill well. 19.15.13.10(A), (B) NMAC. If a pooled working interest owner elects not to participate in the proposed infill well, the owner is deemed to become a "non-consenting owner with respect to the infill well" and the operator must:

withhold from the proceeds of the well's production accruing to the working interest of a non-consenting owner the non-consenting owner's share of costs, as defined in 19.15.13 NMAC, of the infill well, together with a risk charge computed at the same rate as provided in the pooling order with respect to the initial well.

19.15.13.10(C) NMAC.

**{18}** In 2018, the Commission added a separate definition for an "infill horizontal well," effectively removing wells meeting the definition of "infill horizontal wells" from the general definition of an "infill well" found in 19.15.13.9 NMAC. The 2018 regulations define an "infill horizontal well" as:

> [A] horizontal well the completed interval or intervals of which are located wholly within the horizontal spacing unit dedicated to a previously drilled *or proposed* horizontal well in the same pool and that the operator designates as an infill horizontal well on form C-102. For the purposes of this definition, "proposed" means that an [application for permit to drill] has been submitted to a regulatory agency.

19.15.16.7(H) NMAC (emphasis added). The Commission then provided that "[t]he provisions of 19.15.13.10 NMAC [establishing a non-consenting owner's financial obligations with respect to infill wells] shall apply to any proposal to drill an infill horizontal well in a horizontal spacing unit subject to a compulsory pooling order unless the order includes specific provisions for such additional well." 19.15.16.15(B)(9)(c) NMAC.

**B.      Jalapeno's Challenges to the 2018 Rules Concerning Infill Horizontal Wells**

**{19}** Jalapeno makes two arguments on appeal related to the 2018 Rules regarding infill horizontal wells. First, Jalapeno contends that the effect of the adoption of the newly promulgated definition of "infill horizontal well" is arbitrary and capricious and is contrary to law because it violates the correlative rights of non-consenting owners bound by compulsory pooling orders. Second, Jalapeno contends the Commission's imposition of a two hundred percent risk charge on multiple infill horizontal wells ignores the language of the statute authorizing those charges.

**1.      Effect of the Definition of "Infill Horizontal Well" and Correlative Rights of Non-Consenting Owners**

**{20}** Jalapeno contends that by allowing multiple infill horizontal wells to be proposed contemporaneous with an initial horizontal well, the Commission has violated non-consenting owners' correlative rights because the rule: (1) insures pooled owners cannot afford to participate in development of multiple wells subjecting them to a three hundred percent assessment of well costs and risk charges; (2) deprives pooled owners of the opportunity to learn the results of the initial well before deciding whether to

participate in infill wells; and, (3) allows operators to collect a two hundred percent risk charge on multiple wells, while bearing very little risk themselves.

**{21}**    In light of our standard of review, we cannot conclude that the 2018 Rule setting out a new definition for an infill horizontal well should be set aside for any of the reasons articulated by Jalapeno. *See Bass Enters. Prod. Co.*, 2010-NMCA-065, ¶ 45 (holding that a rule is to be set aside only if it is "unreasonable or without a rational basis when viewed in light of the whole record"). At the hearing on the proposed rule changes, the Commission considered the effect of the proposed definition of an infill horizontal well allowing an operator to propose drilling the initial well and multiple infill wells at the same time, taking into account the correlative rights of the pooled owners, as well as the Commission's obligation to prevent waste. During its discussion, members of the Commission recognized that the protection of the correlative rights of pooled owners weighs equally with the obligation to prevent waste. In taking both interests into consideration, members of the Commission acknowledged the need to "adopt a horizontal rule that is designed for the 21st century," requiring that the Commission "consider these factory mining techniques [of drilling multiple wells simultaneously] that people are doing in other parts of the country." Commissioner Balch recognized that "these reservoirs are essentially being created by these large-scale multistage fractures[,]" and asked, "[I]f you have an offset tract in that pool which is defined as one of these horizons that are never going to produce without that kind of reservoir generation [created by multiple wells], then are you really having something taken from you [when it is something] you . . . can't do on a vertical scale?" He also recognized that the Commission must "be careful to make sure that the same level of protection that already exists is included in the new rule in regards to correlative rights." To that end, members of the Commission commented that pooled owners are "still afforded the right and opportunity to participate[,]" as they have "the ability to go to the force pool hearing and ask for a reduced risk . . . if [they] don't like the agreement and [they] feel like [their] correlative rights have been . . . stepped on or [their] production has been stolen from [them] or taken . . . then [they] have the recourse that [pooled owners have used in other cases] . . . of taking it to district court." At the conclusion of the hearing, the Commission found that "there was substantial evidence to support changes [adopting the definition of 'infill horizontal well'] based on the current and expanding practice of simultaneously drilling adjacent horizontal wells to increase production and reduce waste." It further concluded that "the rule changes are reasonable and further the goals of the . . . Act."

**{22}**    The record is clear that the Commission considered the impact of the proposed infill horizontal well definition on the correlative rights of owners and reasoned that those rights were properly protected by the notice and opportunity to be heard guaranteed by the Act. Jalapeno has not challenged the Commission's finding that the amended rule allowing the simultaneous drilling of adjacent horizontal infill wells will "increase production and reduce waste." *See* Rule 12-318(A)(4) (requiring a party on appeal to "set forth a specific attack on any finding, or the finding shall be deemed conclusive"). Because Jalapeno has not shown that the Commission's adoption of the definition of an "infill horizontal well" is not reasonably related to its legislative purpose, we cannot

conclude that its decision is arbitrary or capricious. *See* § 70-2-11(A) (providing the Division with the power and duty to prevent waste); § 70-2-11(B) (explaining that the Commission has concurrent authority with the Division); *Cont'l Oil Co. v. Oil Conservation Comm'n*, 1962-NMSC-062, ¶ 27, 70 N.M. 310, 373 P.2d 809 ("The prevention of waste is of paramount interest and protection of correlative rights is interrelated and inseparable from it."); *Earthworks' Oil & Gas Accountability Project*, 2016-NMCA-055, ¶ 11 (noting that the party challenging the validity of a rule bears the burden of showing that the rule is arbitrary or capricious). To the extent Jalapeno relies on *Viking Petroleum, Inc. v. Oil Conservation Commission*, 1983-NMSC-091, ¶ 21, 100 N.M. 451, 672 P.2d 280, for the proposition that "[t]he granting or refusal to grant [compulsory] pooling . . . , the amount of costs to be reimbursed to the operator, and the percentage risk charge to be assessed, if any, are determinations to be made by the Commission on a case-to-case basis and upon the particular facts in each case[,]" Jalapeno fails to explain how a pooled owner's right to challenge the risk charge set in 19.15.13.8(A), (D) NMAC is insufficient to protect an owner's correlative rights or provide the review contemplated in *Viking*.

**{23}**     Jalapeno also challenges the newly promulgated definition of an "infill horizontal well," because the definition includes *proposed* wells in addition to completed wells, which differs from the definition of other "infill wells" which must be "*completed* and not plugged and abandoned." *Compare* 19.15.16.7(H) NMAC (defining "infill horizontal well" as "a horizontal well the completed interval or intervals of which are located wholly within the horizontal spacing unit dedicated to a previously drilled *or proposed* horizontal well in the same pool" (emphasis added)), *with* 19.15.13.7(A) NMAC (defining "infill well" as "a well in a compulsory pooled . . . spacing unit to be completed in a pool in which an existing well drilled pursuant to the compulsory pooling order *has been completed* and not plugged and abandoned" (emphasis added)). The Commission, however, is authorized to make rules to carry out the purpose of the Act, *see* § 70-2-11(A), and concluded that the promulgation of the definition of an "infill horizontal well" was appropriate to reduce waste in furtherance of its legislative mandate. Accordingly, we conclude that Jalapeno has failed to show that the newly promulgated definition of an "infill horizontal well" is arbitrary and capricious or not in accordance with law on the grounds that it violates Jalapeno's correlative rights.

## 2.     The Infill Horizontal Well Rule in Relation to Section 70-2-17(C)

**{24}**     Next, Jalapeno argues the newly promulgated rule defining an "infill horizontal well" runs afoul of Section 70-2-17(C) by disregarding the permissive language in the statute and expanding the risk charge from its application to a specific, identified well that is the subject of a compulsory pooling agreement to all infill side-by-side wells.

**{25}**     Section 70-2-17(C) provides that the compulsory pooling order "*may* include a charge for the risk involved in the drilling of such well[,]" and limits the risk charge to no more than two hundred percent. (Emphasis added.) Jalapeno first contends that the two hundred percent presumptive risk charge set out in 19.15.13.8(A) NMAC is not in accordance with law because it disregards the permissive language in the authorizing

statute, arguing that "[t]he [C]omission has read 'may' to mean 'shall[,]' [a]nd 'shall' means [']will['] be [two hundred percent]." We note, however, that 19.15.13.8 NMAC has been in effect since 2008, has been applied to compulsory pooling orders since that time, and was not amended as a part of the rulemaking process that is the subject of this appeal. We are therefore precluded from reviewing whether 19.15.13.8(A) NMAC is not in accordance with Section 70-2-17(C), as the time to appeal has long run.

**{26}** Consequently, we limit our review to whether the Commission improperly expanded the application of the risk charge to all infill side-by-side wells, rather than limiting its application to specific, identified wells. By promulgating the horizontal infill well rule, "[t]he Commission," Jalapeno complains, "functionally hands imposition of the risk charge to the [compulsory] pooling operator instead of requiring evidence upon which it shall decide the percent of risk charge, if any, case[-]by[-]case and well[-]by[-]well." Jalapeno's argument, however, fails to acknowledge that, just as is the case with other types of wells, infill horizontal wells are subject to a two hundred percent risk charge only if the pooling order is entered without challenge to this charge. The Commission may not enter a pooling order and may not approve a risk charge without affording all affected owners notice and an opportunity for hearing. *See* § 70-2-17(C) ("All orders effecting such pooling shall be made after notice and hearing[.]"). Risk charges, if challenged, must be determined by the Commission on the basis of the evidence presented, 19.15.13.8(D) NMAC (setting out procedures to challenge risk charges), and an owner who disagrees with the risk charge adopted by the Commission, after hearing, may appeal to the district court. *See* § 70-2-25(B) (permitting a party of record to appeal to district court). We conclude that this procedure for notice and hearing satisfies the Commission's statutory obligation to determine risk charges "on a case-to-case basis and upon the particular facts in each case." *Viking Petroleum, Inc.*, 1983-NMSC-091, ¶ 21.

## IV.    Transitional Provisions

**{27}** Jalapeno challenges the Commission's adoption of transitional provisions, which provide the following:

> Any horizontal well drilled, commenced or permitted prior to June 26, 2018 shall retain as its horizontal spacing unit the standard or non-standard spacing unit or project area originally dedicated thereto. If that area is not a standard horizontal spacing unit as provided in Subsection B of 19.15.16.15 NMAC, that area is hereby approved as a non-standard horizontal spacing unit for the horizontal well so drilled, commenced or permitted.

19.15.16.15(E)(4) NMAC. We understand Jalapeno's challenge to have two grounds: (1) the rule was arbitrary and capricious because the Commission did not sufficiently explain the basis for its decision; and (2) the rule is not in accordance with law because the Commission failed to provide sufficient notice to those impacted by the rule.

## A.  Sufficiency of the Commission's Explanation

**{28}**  We first address Jalapeno's argument that the Commission did "not recite support or rationale for its attempted reach-back approval of prior [compulsory] pooling spacing units." "In adopting a new rule, an administrative agency is required to provide a statement of reasons for doing so." *Earthworks' Oil & Gas Accountability Project*, 2016-NMCA-055, ¶ 12. "Although formal findings are not required, the record must indicate the reasoning of the Commission and the basis on which it adopted the rule." *Id.* (alteration, internal quotation marks, and citation omitted). "The Commission need not state its reasons for adopting each provision in a rule or respond to all concerns raised in testimony; such a requirement would be unduly onerous and unnecessary for the purposes of appellate review." *Id.* (omission, internal quotation marks, and citation omitted). "We require only that the public and the reviewing courts are informed as to the reasoning behind the rule." *Id.* (alteration, internal quotation marks, and citation omitted).

**{29}**  Here, the Commission heard testimony that the transitional provisions were intended to provide clarity and consistency with regard to existing horizontal wells, which would be grandfathered into the revised regulatory framework. Indeed, in its order adopting the rule changes, the Commission explained:

> [T]he Commission's rules need to be updated to provide greater clarity and specificity for horizontal wells and to meet the Commission's obligations to prevent waste and protect correlative rights, and to adopt rules to fix the spacing of wells and to "require wells to be drilled, operated and produced in such manner as to prevent injury to neighboring leases or properties governing the drilling of wells." [Section] 70-2-12(B).

The Commission further stated "that the proposed rule changes, as amended, expand upon the current limited rules governing horizontal wells and provide clear direction to the agency and the operators on the requirements, and the approval process, for horizontal wells, and provide limitations and flexibility where needed." To that end, the Commission explained that 19.15.16.15 NMAC would be amended such that "[e]*ach horizontal oil or gas well* must be dedicated to a standard or non-standard horizontal spacing unit." (Emphasis added.)

**{30}**  Although the Commission's order did not explain with specificity its rationale for adopting 19.15.16.15(E)(4) NMAC, its reasoning for adopting the rule changes demonstrates a rational connection between the testimony concerning the transitional provisions and the Commission's adoption of the transitional provisions. *See Bass Enters. Prod. Co.*, 2010-NMCA-065, ¶ 45 (providing the standard for setting aside a rule on grounds that it is arbitrary and capricious). We therefore reject Jalapeno's argument and proceed to an examination of its notice argument.

## B.  Sufficiency of the Notice

**{31}** In its challenge to the Commission's notice, Jalapeno does not argue that the Commission failed to adhere to its statutory and rule-based notice obligations. *See* § 70-2-23 (providing that, before the Commission adopts a rule or regulation, it must first hold a public hearing on the matter and must "give reasonable notice of such hearing (in no case less than ten days, except in an emergency)"); 19.15.3.9 NMAC (providing the means by which the Commission must provide notice and the content required in the notice). Rather, it argues the Commission's purported failure to notify several compulsory pooled owners that the proceeding "had as a subject the examination into the efficacy of prior-ordered horizontal spacing units" amounted to a deprivation of their constitutional due process rights.[5] It appears to also argue the transitional provisions improperly modified existing spacing orders without substantial evidence showing a change of condition or a change in knowledge of conditions. However, Jalapeno raised this argument for the first time in its reply brief and we therefore limit our discussion to its due process argument. *See Guest*, 2008-NMCA-144, ¶ 36; *see also* Rule 12-318(C).

**{32}** To support its due process argument, Jalapeno relies on *Johnson v. New Mexico Conservation Commission*, 1999-NMSC-021, 127 N.M. 120, 978 P.2d 327, and *Uhden v. New Mexico Oil Conservation Commission*, 1991-NMSC-089, 112 N.M. 528, 817 P.2d 721. To be sure, our Supreme Court has held:

> [I]f a party's identity and whereabouts are known or could be ascertained through due diligence, the due process clause of the New Mexico and United States Constitutions requires the party who filed a spacing application to provide notice of the pending proceeding by personal service to such parties whose property rights may be affected as a result.

*Uhden*, 1991-NMSC-089, ¶ 13. However, this holding was limited to the context of an adjudicatory, rather than a rulemaking, proceeding. *Id.* ¶ 7; *see Rayellen Res., Inc. v. N.M. Cultural Props. Review Comm.*, 2014-NMSC-006, ¶ 25, 319 P.3d 639 (noting that "*Uhden* held that notice by publication was inadequate because the [c]ommission's hearing of Amoco's well application was not a rule-making proceeding but, in effect, an adjudication of the mineral rights owner's property right"). Jalapeno has neither argued that the proceeding at issue in the case at bar was adjudicatory in nature nor cited authority from which we can conclude *Uhden*'s holding applies in a rulemaking proceeding. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076; *see also Curry*, 2014-NMCA-031, ¶ 28. Moreover, in *Johnson*, our Supreme Court expressly declined to address the issue of constitutional due process. 1999-NMSC-021, ¶ 18 ("In this case, however, we do not rely on the *Uhden* [C]ourt's constitutional rationale."). Ultimately, however, Jalapeno provides no authority bearing

---

5To the extent Jalapeno's argument bears upon the Commission's obligation to provide "a summary of the full text of the proposed rule[,]" 19.15.3.9(B)(1) NMAC, Jalapeno has failed to cite authority from which we can conclude the Commission's summary of the proposed changes, which provided, "19.15.16.15 NMAC will be amended to collect in a single section those rules that apply to horizontal wells and proposes revisions to comprehensively regulate such wells," was insufficient. *See Curry v. Great Nw. Ins. Co.*, 2014-NMCA-031, ¶ 28, 320 P.3d 482.

upon whether the failure to provide notice of a proposed rule's content and effect to the level of specificity and complexity Jalapeno seeks amounts to a deprivation of constitutional due process.[6] *See Curry*, 2014-NMCA-031, ¶ 28. Accordingly, we decline to address this argument further.

**CONCLUSION**

**{33}**    For the foregoing reasons, we affirm.

**{34}    IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**JANE B. YOHALEM, Judge**

---

6Jalapeno appears to rely on *Johnson* for this proposition. However, we reemphasize that *Johnson* expressly avoided the constitutional question and instead relied on the notice requirements as provided by rule. 1991-NMSC-021, ¶ 25.